**Harold L. STRAITWELL,
Plaintiff–Appellee,**

v.

**NATIONAL STEEL CORPORATION,
Defendant–Appellant,**

v.

**THOMSON NEWSPAPERS, INC., Third
Party Defendant–Appellee,**

**and**

**Weirton Steel Corporation, Third
Party Defendant.**

No. 88–3883.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 10, 1989.

Decided March 9, 1989.

Rehearing and Rehearing In Banc
Denied April 11, 1989.

 

Carl Nicholas Frankovitch (Mark A. Colantonio, Volk, Frankovitch, Anetakis, Recht, Robertson & Hellerstedt, Donald E. Seymour, Richard W. Hosking, James R. Segerdahl, Kirkpatrick & Lockhart, on brief), for defendant-appellant.

Paul Joseph McArdle, Christine Machel (Frank Cuomo, Jr., William E. Watson & Associates, on brief), for appellees.

Before SPROUSE and CHAPMAN, Circuit Judges, and HENDERSON, United States District Judge for the District of South Carolina, sitting by designation.

SPROUSE, Circuit Judge:

This is an appeal by National Steel Corporation from a judgment against it on a jury verdict for $225,000 in favor of Harold L. Straitwell in his diversity action alleging that National defamed him in a news release it caused to be published. National also appeals from the district court's imposition of sanctions under rule 11 of the Federal Rules of Civil Procedure, awarding Thomson Newspapers, Inc., attorney's fees of $16,373.79, and from its imposition of $2,279.71 in costs. Thomson had been impleaded by National but then voluntarily dismissed on the latter's motion. Holding that the district court should have directed a verdict in National's favor, we reverse the judgment in favor of Straitwell. In our view, the district court's imposition of rule 11 sanctions and costs was grounded on insufficient consideration of the facts; we reverse that portion of the district court's judgment and remand with instructions for additional fact findings.

I

Straitwell is a lubrication and hydraulics engineer. He began working for National in 1968 and was assigned to National's Weirton, West Virginia, division in 1978. National terminated his employment on October 25, 1983, after an in-house investigation of the activities of several management employees. At that time, he appar-

ently had authority to approve or to recommend the vendors from which National purchased lubricants for its steelmaking processes at the Weirton division.

National initiated the investigation of some management personnel at the Weirton division in September 1983 in response to reports of improper business conduct by some management employees. The investigation initially focused on two employees other than Straitwell but later expanded to include inquiries into Straitwell's alleged favoritism toward a company that sold industrial lubricants. On October 5, 1983, a company investigator interviewed Straitwell and informed him that he was suspended. National permanently terminated the two other employees who were the initial targets of the investigation on October 13. The next day, on October 14, 1983, it issued the news release that resulted in this litigation to the news media of Weirton and the surrounding communities in the upper Ohio Valley. The release stated:

> An investigation of alleged improper actions by certain Weirton Steel management employees has been completed. The results of the investigation are sufficient to justify the termination of employment of the employees against whom the allegations had been made. However, the results of the investigation were insufficient to pursue legal actions against the employees alleged to be involved.

> This action is consistent with our Company's policy of maintaining the highest possible level of management standards.

Television and radio stations immediately broadcast stories based on the release, and, the following day, several area newspapers published related articles. On October 25, eleven days after National issued the release, it discharged Straitwell.

## II

National contends that the news release was protected by a qualified privilege that it did not abuse, that the release was not defamatory, that the release did not refer to Straitwell, that the release was substantially true, that Straitwell was not injured, and that the district court committed several trial errors. It also contends, of course, that the district court erred in awarding attorneys' fees and costs to Thomson. We first consider the judgment in favor of Straitwell. Because we conclude that a qualified privilege protected National's issuance of the news release and that National did not abuse the privilege, we do not address the remaining contentions relating to Straitwell's action.

The law of West Virginia concerning the essential elements for a successful defamation action by a private individual is well established. In *Crump v. Beckley Newspapers*, 320 S.E.2d 70 (W.Va.1984), the West Virginia Supreme Court of Appeals stated that those elements are "(1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." *Id.* at 77 (citations omitted).

The law defining the qualified privilege defense is equally well established in West Virginia. The court in *Crump* explained:

> Qualified privileges are based upon a public policy that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public.... A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter.... [A] bad motive will defeat a qualified privilege defense.... In an action of libel based on a publication qualifiedly privileged, an abuse of the privilege destroys the protective characteristics of the privilege.

> ....

> Some examples of the types of situations in which a qualified privilege has been recognized include (1) the publication of defamatory material for the protection or advancement of the defendant's own legitimate interests; (2) the

publication of defamatory material for the protection of the legitimate interests of others; (3) where the communication between the publisher and the recipient is designed to promote a mutual interest; (4) where the communication is made to one discharged [sic] with the performance of a public duty; (5) reports of public proceedings; and (6) fair comment on matters of public concern.

*Id.* at 78–79 (citations and quotation marks omitted).

The West Virginia court in *Crump* further explained that a qualified privilege may be defeated if the publisher abuses it by intentionally publishing false material, publishing false material with reckless disregard for its truth or falsity, publishing false material to persons who have no reason to receive the information, publishing false material with a primary purpose unrelated to the purpose of the privilege, or publishing with actual malice or bad motive. *Id.* at 78; *see England v. Daily Gazette Co.*, 143 W.Va. 700, 104 S.E.2d 306, 311–12 (1958). Determining whether a qualified privilege exists and whether it has been lost through abuse are questions of law for the court unless those decisions rest on controverted facts. *Id.* 104 S.E.2d at 313–14; *see Crump*, 320 S.E.2d at 81; *see also Porter v. Eyster*, 294 F.2d 613, 618 (4th Cir.1961).

 The West Virginia law concerning qualified privileges is straightforward, and its application to the facts of this case is uncomplicated. In the face of general adversity facing this country's steel industry, National decided to sell its Weirton division facilities and publicly announced that decision in 1982. At that time, over 8,000 employees from Weirton and the surrounding counties in West Virginia, Ohio, and Pennsylvania were employed by this steel division. The effect of the announcement on Weirton and the surrounding communities was pronounced. Record evidence paints the picture of a frantic effort to retain the steelmaking facilities that completely dominated the economic well-being of the area.

As part of that effort, representatives of management and plant labor organizations, through a joint committee, conducted studies that eventually resulted in an employee stock ownership plan through which the employees purchased the division's assets by forming the Weirton Steel Corporation. Activities concerning the potential employee acquisition and operation of the facilities by the newly-formed corporation dominated the news in several area counties throughout this period. As part of the final negotiated purchase, employees were required to agree to a substantial reduction in wages. Due to that reduction and other factors, the contemplated acquisition was controversial, and general community unrest about improper business conduct by some management employees helped fuel the controversy.

Out of this background, Robert Loughhead, then the President of National's Weirton division who became the President of the new Weirton Steel Corporation in 1984, testified that he initiated the investigation into company practices of some management personnel. He testified that he had made a commitment to the people of the community to inform them of the facts of National's investigation and any actions stemming from it, indicating that there was community interest in the underlying problem. After National discharged the two employees on October 13, therefore, Loughhead decided to issue the involved news release relating to the investigation. National later terminated Straitwell on October 25.

Straitwell cannot seriously contend that, under these circumstances, National did not have a qualified privilege to publicize its investigation. He primarily contends, however, that National lost its qualified privilege by abusing it. He argues that National issued the news release with an improper motive and published it to an audience far in excess of that needed to accomplish its stated purposes. We do not agree.

Straitwell notes that National purportedly discharged him because he exhibited favoritism toward a vendor. He asserts that the allegation was false and that National officials orchestrated the sequence of his suspension, the issuance of the news release, and his later discharge to injure his

reputation. The record, however, is devoid of any evidence supporting that theory, and, despite Straitwell's argument to the contrary, to permit a jury to infer a bad motive from the bald facts of the investigation, the news release, and Straitwell's discharge would be far too speculative.

Straitwell also argues that National's employees were the only audience interested in the investigation and that National could have directed the information contained in its news release to the employees simply by posting notices in the plant or by publishing a story in its weekly employee newsletter. He contends that distributing the release to the news media in Weirton and the surrounding communities was excessive and, therefore, constituted an abuse of the qualified privilege. We cannot agree, however, that issuing the news release to the media rather than limiting its publication to the employees exceeded the scope of National's therapeutic purposes. Considering the number of National employees and the population of Weirton, it is apparent that the community at large was practically coterminous with the employees and their relatives and acquaintances. National obviously believed that the preservation of community trust was important to its efforts. Under the totality of the circumstances, we do not view as excessive its efforts to inform both its employees and their community neighbors. The district court should have determined, as a matter of law, that National did not abuse its qualified privilege to issue the news release.

## III

■ Thomson Newspapers, Inc., publishes, among other newspapers, the Steubenville Herald Star in Steubenville, Ohio. On October 15, 1983, it published a story containing information from National's news release and added the headline, "Kickback Scheme Results In Firings." No language in the news release alluded to a kickback scheme, and the evidence, at most, was tenuous as to whether that term originated from National's public relations personnel. A Steubenville Herald Star reporter testified that a National employee privately told her several months before the issuance of the news release that the kickback investigation was continuing. She stated that he was responding to her questions over the telephone at the time and that she could not remember if she originally used the word "kickback" in her questioning.

In West Virginia, a headline can be considered in the context of the news article that it purportedly describes in determining the defamatory nature of the publication. *Sprouse v. Clay Communications*, 158 W.Va. 427, 211 S.E.2d 674, 686, *cert. denied*, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975).

[N]o clear-cut rule has been established ... for headlines which are not libel *per se* and, therefore, each case must be considered on its facts. Generally where the headline is of normal size and does not lead to a conclusion totally unsupported in the body of the story, both headlines and story should be considered together for their total impression.

*Id.* A viable legal theory, therefore, may have existed upon which Thomson could have been held liable to Straitwell for any defamation resulting from its publication. A jury could have believed that only the addition of the headline imbued the Steubenville Herald Star article with a defamatory connotation. Under those circumstances, National's claim for contribution against Thomson also may have been viable. While the district court dismissed Thomson from the action based on National's motion, National emphasizes, and Thomson did not contest the assertion during argument, that its dismissal motion was prompted by the court's definitive admonitions that the third-party action should be dismissed.

The district court, in granting Thomson's motion for attorneys' fees and costs, stated that "[t]he court could find no reasonable basis for the third party complaint.... Thomson did no more than publish the news release that [National] submitted. The claim against Thomson is deemed frivolous...."

Under the circumstances of this case, the district court's brief statement is an insufficient finding on which to base the rule 11 award of attorneys' fees and an award of

costs. That portion of the district court judgment, therefore, is reversed and remanded with instructions that the district court make findings of fact concerning the frivolousness *vel non* of National's action against Thomson in light of West Virginia law at the time that National impleaded Thomson.

### IV

The Straitwell judgment is reversed and remanded with instructions to dismiss it. The Thomson award of attorneys' fees and costs is reversed and remanded with instructions that the district court make findings of fact and reconsider Thomson's motion based on such findings.

REVERSED AND REMANDED WITH INSTRUCTIONS.