Thomas J. MERLO, Plaintiff–Appellant,

v.

UNITED WAY OF AMERICA,
Defendant–Appellee,

and

Transamerica Occidental Life Insurance
Company, Defendant.

No. 93–1863.

United States Court of Appeals,
Fourth Circuit.

Argued April 15, 1994.

Decided Dec. 22, 1994.

**ARGUED:** Allen G. Slan, Katz, Frome, Slan & Bleecker, P.A., Rockville, MD, for appellant. Eric Thomas Werner, Verner, Liipfert, Bernhard, McPherson & Hand, Chtd., Washington, DC, for appellee. **ON BRIEF:** Susan Joy Rubin, Katz, Frome, Slan & Bleecker, P.A., Rockville, MD, for appellant. James F. Hibey, Verner, Liipfert, Bernhard, McPherson & Hand, Chtd., David F. Grimaldi, Sr., Stephen P. Zachary, Martell, Donnelly, Grimaldi & Gallagher, Washington, DC, for appellee.

Before ERVIN, Chief Judge, NIEMEYER, Circuit Judge, and HARVEY, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Senior Judge HARVEY wrote the opinion, in which Chief Judge ERVIN and Judge NIEMEYER joined.

## OPINION

ALEXANDER HARVEY, II, Senior District Judge:

In early 1992, appellant Thomas J. Merlo was discharged from his position as Assistant Treasurer and Chief Financial Officer of appellee United Way of America (United Way). This discharge came in the wake of a *Washington Post* investigation of United Way which resulted in nationally publicized allegations concerning financial improprieties, mismanagement and lavish spending by United Way's upper management. The published articles dealt with allegations involving plaintiff, William Aramony, the Chief Executive Officer (CEO) of United Way, and others.

In the suit which he filed below against United Way, Merlo contended, *inter alia,* that his discharge constituted a breach of contract, that a report prepared for United Way's Board of Governors and released to the national media contained defamatory statements and that he had been subjected to an invasion of privacy. In addition, Merlo sought a declaratory judgment that he was entitled to the proceeds of an annuity which he alleged had been purchased for him by United Way. At various stages of the proceedings below, judgment was entered against Merlo on all of his claims.

Merlo has here appealed the following: (1) the district court's grant of United Way's motion for partial summary judgment as to Merlo's claims of breach of contract, promissory estoppel, and invasion of privacy; (2) the district court's jury instruction relating to the defense of qualified immunity asserted by United Way to Merlo's claim of defamation; and (3) the district court's declaratory judgment that United Way, and not Merlo, was entitled to the proceeds of the annuity. For the reasons to be stated, we affirm the judgment below.

### I

United Way is a non-profit organization, incorporated in New York and headquartered in Alexandria, Virginia. United Way acts as a service organization for the approximately 2,100 local United Way organizations. Merlo served as United Way's Chief Financial Officer and Assistant Treasurer from January 1, 1990 until his discharge on March 13, 1992.

Beginning in 1963, Merlo had practiced as a certified public accountant in Florida. In 1989, his gross income from his accounting practice was approximately $200,000 plus various benefits. As part of his accounting firm's practice, Merlo had since the early 1970s performed services on behalf of United Way on a consulting basis. In July of 1989, Merlo was asked by United Way to become its interim Chief Financial Officer (CFO). Merlo accepted the interim position, but carried out his duties from Florida.

Approximately six months later, Aramony, then United Way's CEO, called Merlo at Merlo's home in Florida and the two thereafter met in Florida. At that time, Aramony and Merlo had been personal friends for approximately 25 years. Merlo at the time was 59 years old. During this meeting in Florida, Aramony, acting on behalf of United Way, offered Merlo a permanent position as CFO and Assistant Treasurer of United Way. Merlo accepted this offer.

The terms of Aramony's offer were never put in writing, and the only testimony concerning the terms and conditions of the oral employment agreement was supplied by Merlo.[1] Merlo testified that the oral contract of employment contained the following four terms: (1) that Merlo's employment by United Way would be for the remainder of Merlo's life; (2) that the contract would be terminable by United Way only for good cause; (3) that Merlo would receive an annual salary of $215,000, plus various bonuses and incentives; and (4) that United Way would pay for Merlo to travel to Florida to visit his family and would pay for the rental of an apartment in Virginia, near United Way's headquarters. Beginning in January of 1990, Merlo began working in his new

---

1. Merlo and Aramony were the only participants in the conversations between them concerning Merlo's employment. During the course of the proceedings below, the parties attempted to depose Aramony. However, Aramony invoked his Fifth Amendment privilege and refused to answer any questions.

position at United Way's headquarters in Virginia. However, Merlo maintained his primary residence in Florida.

At some unspecified point of time in late 1991, Aramony learned that two reporters from the *Washington Post* were conducting an investigation into alleged improprieties and irregularities in the governance of United Way. Soon thereafter, United Way hired Investigative Group, Inc. (IGI) to conduct an internal investigation. IGI's preliminary findings were delivered to the Board of Governors of United Way (the Board) in January of 1992. On February 4, 1992, United Way retained a law firm (the Verner firm) to aid in the investigation then under way and to render legal advice concerning United Way's response to any negative publicity that might arise from the *Washington Post* investigation.

On February 11, 1992, Merlo received a letter from Aramony. That letter confirmed a conversation between the two on February 9, 1992, in which Aramony had relieved Merlo of his duties as CFO and Assistant Treasurer. The letter went on to state:

> As I told you, your work product at UWA is not the issue. However, the potential controversy arising from the ongoing press investigation of events that occurred in the past and which have nothing to do with UWA creates a potential for both misunderstanding of the very important work of UWA and embarrassment for UWA. UWA's work and reputation must remain beyond reproach.
>
> In addition, your present health condition makes it, at best, difficult for you to function as UWA's CFO.[2]

The parties agree that the effect of this letter was to place Merlo on "administrative leave."

On February 19, 1992, the *Washington Post* published a front page article charging top management of United Way with mismanagement, cronyism, excessive compensation, and the misuse of funds for personal reasons. The allegations in the article related primarily to Aramony. A large amount of media attention was generated, and soon after the article was published, Aramony took a leave of absence.

On March 13, 1992, Merlo received a letter from Berl Bernhard, Esq., an attorney at the Verner firm. This letter stated:

> As Counsel to the United Way of America, I have been instructed to inform you that your employment with UWA is terminated immediately. Your salary will be discontinued today; no severance or salary extension will be provided. Due to your brief tenure with UWA, you are not eligible for retiree benefits of any kind.

At about the same time, United Way requested that the Verner firm prepare a report for the Board concerning the internal investigation which had been conducted concerning the alleged improprieties. On April 2, 1992, the Verner firm delivered to the Board a document entitled "Report to the Board of Governors of the United Way of America" (the Report). On that same day, United Way held a news conference, at which the Report was made available to the national news media. Concerning Merlo, the Report stated, in essence, that he had failed to adequately perform his job as CFO, that he had failed to maintain adequate accounting procedures for or records of the expenses of the top executives of United Way, and that he had improperly used funds of United Way for personal reasons. In the suit filed by him below against United Way, Merlo asserted that the Report contained defamatory statements about him, and that these defamatory statements were published throughout the country, including his home state of Florida.

In his suit, Merlo also sought to recover from United Way the proceeds of an annuity. In early 1990, soon after Merlo had joined United Way on a permanent basis, United Way had purchased an annuity from Mutual of America (Mutual) in the amount of $375,000. United Way was identified as the "employer-owner" and Merlo as the annuitant. Merlo was to acquire the right to the proceeds of the annuity only at "the expiration of the deferral period, during which [the

---

2. Merlo had stepped on a toothpick, leading to an infection of his foot, a condition which ultimately required surgery and which was ongoing during the course of the proceedings below.

annuitant] remains in the employ of the Employer." It was further provided that Merlo would forfeit any rights to the annuity if his employment was terminated prior to the expiration of the deferral period. During the deferral period, the annuity remained the property of United Way.

The deferral period was initially intended to end on January 1, 1992. However, Merlo had the right to elect to extend the deferral period. Specifically, ¶ 10 of the policy provides:

Subject to the consent of the Employer, a Participant may elect to extend the deferral period by providing the Employer with a Deferred Compensation Election specifying a later date upon which the deferral period is to expire. Such election will automatically [be] extended one year at a time unless at least one year before the agreement would otherwise have automatically been extended, the Participant notifies the Employer that the agreement should end one year following the date of notification to terminate the agreement.

On December 3, 1990, Merlo sent a letter to Mutual which stated, "In accordance with our deferred compensation agreement, I hereby elect to extend the election period to January, 1992." [3] On December 4, 1991, Merlo sent an identical letter to Mutual, electing to extend the deferral period to January 1, 1993. On December 12, 1991, Merlo received a letter back from Mutual, which stated, "Please be sure to also advise United Way of America and its Board about your decision since it is an agreement between yourself and United Way of America." This advice was consistent with ¶ 10 of the policy, which, as noted, required, for the election to be effective, that Merlo inform United Way of his election to extend the deferral period and secure its consent. Merlo never formally notified the Board of his election, nor did United Way in any way formally notify Mutual of its "consent" to the election.

In late December of 1991 or early January of 1992, Merlo contacted Mutual and requested that the funds in the annuity be handed over to him at that time. Mutual informed Merlo that because of his election to extend the deferral period until January of 1993, the annuity remained the property of United Way until that later date. Merlo then instructed Thomas Nunan, United Way's General Manager, to withdraw from the Mutual annuity the total funds, which at that time had grown to $427,188.97. Nunan did so, sending Mutual a letter prepared by Gregory Walthall, United Way's Comptroller. Mutual sent a check made out to United Way, and the funds were deposited into a United Way bank account.

Merlo then had Walthall complete an application for a new annuity to be purchased from Transamerica Occidental Life Insurance Company (Transamerica). Merlo instructed Walthall to work with Jeffrey Bonina, a financial services manager for Transamerica, who worked in Boca Raton, Florida. On January 29, 1992, Nunan signed the application for the Transamerica annuity, which identified United Way as the owner of the policy and Merlo as the annuitant. Nunan also signed a check requisition form for a check to be made out by United Way to Transamerica in the amount of $427,188.97. A check in this amount and the application were then sent to Bonina of Transamerica.

On February 28, 1992, Merlo sent a written request to Transamerica to rescind the annuity. Merlo then signed a second application for a Transamerica annuity in the amount of $307,188.97, an amount exactly $120,000 less than the original Transamerica annuity. This second application identified Merlo as both the owner and the annuitant. Transamerica processed this application, applied the proceeds of the first annuity to the second annuity, and sent Merlo a check for $120,000. On March 5, 1992, Merlo deposited this check in his personal checking account. That same day, Merlo's wife wrote a check on this personal account in the amount of $117,071.35. The check was made out to "Sun Bank" and paid off a mortgage held by Sun Bank on Merlo's home. The payment avoided an impending foreclosure.

---

**3.** As the initial deferral period was not to end in any event until January 1, 1992, this letter was superfluous. Merlo had apparently sent this letter on the advice of an employee of Mutual who had simply misunderstood the policy.

The transfer of funds from the first Transamerica annuity to the second Transamerica annuity did not become known until after March 13, 1992, the date on which Merlo was formally discharged from his position as CFO. After Merlo's discharge, attorneys at the Verner firm conducted an investigation into the status of the first Transamerica annuity. It was not until late March of 1992 that Transamerica confirmed to Verner that the first Transamerica annuity had been rescinded by Merlo and that a check for $120,000 had been delivered to Merlo.

## II

On April 8, 1992, Merlo filed a complaint against United Way in the Circuit Court for Palm Beach County, Florida. On May 7, 1992, United Way removed Merlo's suit to the United States District Court for the Southern District of Florida. During negotiations between the parties, Merlo authorized his counsel to allow United Way to have physical possession of the second Transamerica annuity policy. Subsequently, United Way refused to return the policy to Merlo, and on September 30, 1992, Merlo filed a separate complaint in the Southern District of Florida, alleging a claim for replevin and seeking the return of the policy. On December 30, 1992, the Florida district court consolidated Merlo's two complaints, and pursuant to 28 U.S.C. § 1404(a) transferred the consolidated case to the United States District Court for the Eastern District of Virginia, Alexandria Division.

On March 10, 1993, Merlo filed an amended complaint, which contained the following claims:

Count I, alleging a claim for breach of contract;

Count II, alleging a claim for defamation;

Count III, alleging a claim for invasion of privacy;

Count IV, alleging a claim for tortious discharge;

Count V, alleging a claim for promissory estoppel;

Count VI, alleging a claim for intentional interference with protected pension rights;

Count VII, alleging a claim for fraud;

Count VIII, alleging a claim against Transamerica for breach of contract; and,

Count IX, seeking a declaratory judgment that he was the owner of the second Transamerica annuity.

Count IV, Count VII, and Count VIII (the sole claim against Transamerica) were withdrawn prior to trial. Count VI was settled prior to trial.

Merlo moved for partial summary judgment with respect to his claim for breach of contract, his claim for promissory estoppel, and his request for a declaratory judgment concerning his ownership of the annuity. United Way in turn moved for partial summary judgment on these same claims, as well as on Merlo's claims for defamation and for invasion of privacy. On June 8, 1993, a hearing on both motions was held before Judge Cacheris. At the conclusion of this hearing, Judge Cacheris rendered an oral opinion, denying Merlo's motion in its entirety, granting United Way's motion with respect to Merlo's claims for breach of contract, promissory estoppel, and invasion of privacy, and denying United Way's motion with respect to Merlo's claim for defamation.

The parties subsequently stipulated that the issue pertaining to Merlo's ownership of the annuity would be decided by the Court rather than by a jury. Thus, only Merlo's claim for defamation remained open for trial before a jury.

On June 15, 1993, the matter came on for trial before Judge Bryan and a jury. The trial lasted three days, and on June 17, 1993, the jury returned a verdict in favor of United Way on Merlo's claim for defamation. Following the entry of the jury's verdict, Judge Bryan, in a brief ruling from the bench, ruled that the annuity was owned by Merlo, and not by United Way. An Order to such effect was then entered.

On July 1, 1993, United Way filed a motion to amend the judgment, contending that the district court had improperly awarded Merlo ownership of the annuity. On July 20, 1993, Judge Bryan entered a Memorandum Opinion and Order granting United Way's motion to amend and alter the judgment and vacat-

ing his earlier Order. The proceeds of the second Transamerica annuity were awarded to United Way, and Merlo was ordered to pay to United Way the proceeds of this annuity which had been expended by him or on his behalf.

### III

■ This Court reviews *de novo* the district court's grant of a motion for summary judgment. *E.g., Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 874 (4th Cir.1992). The district court granted United Way's motion for partial summary judgment with respect to Merlo's claims for breach of contract, promissory estoppel, and invasion of privacy. We conclude here that the district court correctly decided that United Way was entitled to summary judgment with respect to all three of these claims.

■ The district court correctly reasoned that the choice of law rules of Florida were to be applied. As a transferee court, the district court was required to apply the law which would have been applied by the transferor court. *Ferens v. John Deere Co.,* 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). Pursuant to *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the transferor court in this case was required to apply the choice of law rules of Florida. Applying Florida's choice of law rules, the district court concluded that the law of Virginia was to be applied to Merlo's claims for breach of contract, promissory estoppel, and invasion of privacy.

On appeal, Merlo has not challenged the district court's interpretation of Virginia law. Rather, Merlo argues that the district court misinterpreted Florida's choice of law rules, and that the law of Florida should have been applied to his claims for breach of contract, promissory estoppel, and invasion of privacy. We need not in this case consider Merlo's arguments based on choice of law principles. Merlo's contentions are of no moment unless Florida law would have dictated a result contrary to that reached below. From our review of the Florida law, we conclude that Merlo's claims for breach of contract, promis-

sory estoppel, and invasion of privacy must all fail.

■ Merlo's breach of contract claim fails under Florida's Statute of Frauds. Florida's Statute of Frauds provides that, "[n]o action be brought ... upon any agreement that is not to be performed within the space of one year from the making thereof." Fla.Stat. § 725.01. Under Florida law, an employment contract for more than one year is not enforceable under the State's Statute of Frauds. *E.g., Niagara of Fla., Inc. v. Niagara Therapy Mfg. Corp.,* 231 So.2d 277 (Fla.Dist.Ct.App.1970). The Florida courts have, however, recognized an exception to this rule for "lifetime" employment contracts, based on the theory that a contract for lifetime employment could be performed within one year if the employee died. *Hesston Corp. v. Roche,* 599 So.2d 148, 152 (1992). Nevertheless, a valid oral lifetime contract has rarely been upheld by the Florida courts. As the court in *Hesston* noted, such contracts are disfavored and are rarely enforced because of indefiniteness and uncertainty. *Id.* at 150. In order to address these concerns, Florida law requires that a "lifetime" contract be supported by "independent consideration" and that such consideration be other than the relinquishment of another or better paying position, an act regarded as concomitant to virtually all employment contracts. *Id.* at 151–52.

In this case, the only claimed "consideration" for Merlo's alleged "lifetime" employment contract was that he gave up his accounting practice in Florida. However, it is clear from the record that he thereby suffered no financial loss. Under Florida law, circumstances such as those present here are insufficient to support a valid "lifetime" contract. Accordingly, Merlo's alleged oral agreement with Aramony, including the "good cause" provision, is unenforceable under Florida's Statute of Frauds. Merlo was therefore an at will employee and has no cause of action against United Way for breach of contract.

■ For similar reasons, Merlo's claim of promissory estoppel must fail under Florida law. The Florida courts have specifically rejected the use of the common law doctrine

of promissory estoppel to defeat the effect of the legislative rule contained in the State's Statute of Frauds. *Tanenbaum v. Biscayne Osteopathic Hosp. Inc.*, 190 So.2d 777, 779 (Fla.1966). Accordingly, Merlo may not in this case invoke the doctrine of promissory estoppel to claim the benefit of the "good cause" clause of his alleged oral contract, since that clause is unenforceable under Florida's Statute of Frauds.

Finally, Merlo's claim of invasion of privacy is also not maintainable under Florida law. The elements of the tort of invasion of privacy in Florida are: (1) public disclosure; (2) of private facts; and (3) when such disclosure would be offensive and objectionable to a reasonable man of ordinary sensibilities. *Cape Publications, Inc. v. Hitchner*, 514 So.2d 1136 (Fla. Dist. Ct.App.1987) (citing Prosser, *Law of Torts*, § 117 (4th ed. 1971)). Neither Merlo's amended complaint nor his arguments advanced in the district court and in this Court make clear what "private facts" were publicly disclosed by United Way. The essence of Count III of his amended complaint is simply that the Report thrust Merlo unwillingly into the public spotlight. However, a plaintiff "cannot complain when an occupation in which he publicly engages is called to public attention." Prosser, *Law of Torts* § 117, at 858 (5th ed. 1984).

A somewhat analogous situation was presented in *Jacova v. Southern Radio and Television Co.*, 83 So.2d 34 (Fla.1955). Defendant in that case had televised a film of a police gambling raid of a Miami Beach restaurant. Plaintiff was at the restaurant, although not engaged in any illegal activity. Relying on the fact that he had appeared in the film which was broadcast by the defendant, plaintiff sued for invasion of privacy. The court held that the television company had a qualified privilege to broadcast the picture of an individual who had unwillingly become an "actor" in a newsworthy event. *Id.* at 37. Similarly, in this case, Merlo became an "actor" in a newsworthy event when his activities as the CFO of United Way came into question. The Report contains various allegations concerning Merlo's activities as CFO of United Way, but does not reveal any intimate details of Merlo's private life. Under these circumstances, Merlo has not under Florida law suffered an "invasion of privacy."

For these reasons, we conclude that Merlo's claims for breach of contract, promissory estoppel, and invasion of privacy must all fail under Florida law. We accordingly affirm the district court's granting of United Way's motion for partial summary judgment with respect to those three claims.

IV

A district judge has broad discretion in framing his jury instructions. *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1164 (4th Cir.1986). At the trial of this case, United Way raised the defense of "qualified immunity" to Merlo's claim of defamation. During his charge to the jury, Judge Bryan said the following:

The Court has ruled that this case is a case where the report is a communication which is qualifiedly privileged. A communication made in good faith on a subject matter in which the person communicating the same has an interest or owes a duty, legal, moral or social, is privileged if made to persons having a corresponding interest or duty, and the statement and writing, though otherwise libelous, cannot warrant a verdict for the plaintiff.

However, this privilege, if abused, can be lost. If you believe from clear and convincing evidence that the defendant made the publication, caused the publication of the report with actual malice, or even though it believed the words to be true it used language which was intemperate or disproportionate in strength and violence to the occasion, and which was unnecessarily defamatory of the plaintiff, or not in good faith and without an honest belief in its truth, or their truth, or with reckless disregard of whether it was true or not, or deliberately adopted a method for making the publication which gave unnecessary publicity to it, or if it was done for the purpose of gratifying some sinister or corrupt motive, such as hatred, revenge, personal spite, ill-will, or desire to injure the plaintiff, or with such gross indifference or recklessness as to amount to a

wanton or willful disregard of the rights of the plaintiff, then the defendant abused the privilege to which it otherwise might have been entitled and which might otherwise have attached to the occasion, and the privilege is lost.[4]

The parties agree that Judge Bryan's instruction is an accurate statement of the law of qualified privilege under the law of both Florida and Virginia. *Nodar v. Galbreath*, 462 So.2d 803 (Fla.1984); *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 334 S.E.2d 846 (1985). On appeal, Merlo argues, in essence, that Judge Bryan's instruction on qualified privilege should not have been given at all, because the evidence was undisputed that the privilege had been abused. Specifically, Merlo contends: (1) that the language used in the Report was disproportionate in strength or violence; (2) that statements about him in the Report were made in a "bad faith" attempt to use him as a scapegoat for the problems of United Way; and (3) that the Report was disseminated too broadly. Merlo's first two contentions are clearly without merit. As disclosed by the record here, the facts presented at the trial reasonably could have supported a conclusion that the Report did not use overly "violent" language and that the Report was made in good faith.

■ Merlo has also argued that, by disseminating the Report at a press conference attended by national media, United Way abused any qualified privilege which it might have had. "A communication, made in good faith, on a subject matter in which the person communicating has an interest, or owes a duty, legal, moral or social, is qualifiedly privileged if made to a person having a corresponding interest or duty." *Great Coastal*, 334 S.E.2d at 853 (quoting *Taylor v. Grace*, 166 Va. 138, 184 S.E. 211, 213 (1936)). A qualified privilege thus exists if the challenged communication is made to those with a legitimate interest in the subject matter of the communication.

Merlo does not dispute that United Way had a qualified privilege to distribute the Report to the members of the Board, as well as to the 2,100 local United Way organizations. However, Merlo contends that the dissemination of the Report to the public at large was unnecessary. By way of response, United Way asserts that its millions of donors all had a legitimate interest in the subject of the Report, and that therefore its publication of the Report through the national media was a legitimate exercise of its qualified privilege.

A somewhat similar situation was presented in *Straitwell v. National Steel Corp.*, 869 F.2d 248 (4th Cir.1989).[5] The defendant corporation in that case had issued a press release critical of certain of its top management, including Straitwell, who with others was thereafter discharged. Conceding that the employees of the corporation had a legitimate interest in the subject matter of the press release, Straitwell argued that the corporation should have limited publication of the information to its employees. In his opinion, Judge Sprouse said the following:

> We cannot agree ... that issuing the news release to the media rather than limiting its publication to the employees exceeded the scope of National's therapeutic purposes. Considering the number of National employees and the population of Weirton, it is apparent that the community at large was practically coterminous with the employees and their relatives and acquaintances. National obviously believed that the preservation of community trust was important to its efforts. Under the totality of the circumstances, we do not view as excessive its effort to inform both its employees and their community neighbors.

*Id.* at 252.

Similarly, in this case, the jury could reasonably have concluded that United Way's millions of donors had a legitimate interest in the subject matter of the Report, and that publication of the Report by way of the national news media was a reasonable means of

---

4. Merlo timely objected to this instruction.

5. *Straitwell* applied the law of West Virginia, which is identical to the law of both Virginia and

Florida insofar as the issue of qualified privilege is concerned.

communicating the pertinent facts to this vast pool of donors. Accordingly, we conclude that the district court did not abuse its discretion in instructing the jury as it did concerning the defense of qualified immunity.

V

■ Following the conclusion of the trial, Judge Bryan in a brief oral ruling concluded that all the proceeds of the second Transamerica annuity were owned by Merlo. His reasoning was essentially as follows. Judge Bryan interpreted ¶ 10 of the Mutual annuity as requiring notification to and consent by United Way before the deferral period could be extended. On December 3, 1990, Merlo had notified Mutual of his election to extend the deferral period but he never formally notified United Way of this election. Judge Bryan accordingly reasoned that the election was not valid, and that Merlo became the owner of the proceeds of the Mutual annuity on January 1, 1992. He thus concluded that the later Transamerica annuities were necessarily owned by Merlo since they were purchased with *his* money.

In its motion to amend the judgment, United Way argued: (1) that United Way had constructively "consented" to the extension of the deferral period because one of its officers (namely, Merlo) knew of the election; and (2) that if such constructive consent did not exist, then Merlo had breached the fiduciary duties which he owed to United Way by failing to give it notice of his election.

Judge Bryan relied upon this second argument in granting United Way's motion to amend the declaratory judgment. Judge Bryan concluded in his Memorandum Opinion and Order of July 20, 1993 that Merlo was trying to "have it both ways," *i.e.*, making an election to defer and avoid certain tax consequences, but not informing United Way of the deferral because of his desire to be able to claim the proceeds of the Mutual annuity if United Way chose to fire him. Judge Bryan thus determined that Merlo had a fiduciary duty to inform United Way of his election to extend the deferral period. Finding that Merlo breached this duty, Judge Bryan concluded that the Transamerica annuities were purchased with money belonging to United Way and that United Way was therefore entitled to the proceeds of the second annuity. In addition, judgment was entered in favor of United Way for $120,000, the sum paid to Merlo and used by him to pay off his mortgage.

We now affirm, although for slightly different reasons. On the record here, we conclude that Merlo's December, 1991 election to extend the deferral period of the Mutual annuity until January 1, 1993 was valid. Although ¶ 10 of the Mutual annuity required Merlo to "provide[ ] the Employer with a Deferred Compensation Election," the policy did not specify the form which such election was to take or the person to whom it was to be delivered. The sole purpose of this requirement was to allow United Way the opportunity to either consent to or refuse to consent to the election.

Although Merlo did not deliver any formal written document titled "Deferred Compensation Election" to any individual at United Way, the record clearly establishes that all of its responsible officials who were involved in the transaction understood and believed that Merlo had elected to extend the deferral period. Indeed, Merlo himself, the CFO, believed that his election was valid. In late December of 1991 or early January of 1992, Merlo was informed by Mutual that Mutual could not disperse the proceeds of the annuity directly to Merlo because Merlo had elected to extend the deferral period, and the annuity was still the property of United Way. Merlo did not challenge Mutual's position, but rather, acting as the CFO of United Way, in effect consented to the deferral and instructed Nunan, the General Manager, to withdraw the funds from the Mutual annuity. This could be done only if there had been a deferral and if United Way then owned the proceeds. It is thus abundantly clear that Merlo, then the CFO, believed that his election had been valid and that the Mutual annuity was still the property of United Way.

■ At Merlo's request, Nunan sent a letter to Mutual prepared by Walthall, the Comptroller of United Way. This letter requested that the annuity funds be delivered to United Way. Mutual then sent a check

made out to United Way, and this check was deposited into a United Way bank account. Nunan signed the application for the first Transamerica annuity, and the check which was used to purchase this annuity was signed by Walthall and Aramony. United Way was identified as the owner of the first Transamerica annuity. Thus, United Way's General Manager, Comptroller, CFO and CEO—as well as responsible officials at Mutual—all believed that Merlo had validly elected to extend the deferral period of the Mutual annuity and that the funds then belonged to United Way. Furthermore, all of these individuals acted as if United Way had consented to the deferral. Thus, United Way was adequately informed of Merlo's "Deferred Compensation Election," and manifested its consent to this election. Under the terms of the policy, Merlo forfeited any rights he had to the annuity when his employment was terminated prior to the expiration of the policy period. Accordingly, the proceeds of the Mutual annuity were at all relevant times the property of United Way.

 Having determined that the proceeds of the Mutual annuity were the property of United Way, we readily conclude that Merlo breached a fiduciary duty owed to United Way when he unilaterally arranged to have the first Transamerica annuity rescinded and the proceeds paid to him.[6] Although the record here does not disclose in any detail how Merlo convinced Transamerica to rescind the first Transamerica annuity, establish the second Transamerica annuity with Merlo as owner, and give Merlo a check for $120,000, what is perfectly clear is that United Way was neither informed of nor consented to this transaction. Thus, Merlo, the CFO of United Way, simply converted United Way's property to his own use. Under the law of any state, the action taken by Merlo was a breach of fiduciary duty. 3A *Fletcher Cyclopedia Corporations* §§ 1102, 1109 (1994) (citing numerous cases); *In re American Motor Club, Inc.*, 109 B.R. 595, 599 (Bankr.E.D.N.Y.1990) (New York law);

*Crump v. Bronson*, 168 Va. 527, 191 S.E. 663, 667 (1937), *cited in, Dan River, Inc. v. Icahn*, 701 F.2d 278, 283 (4th Cir.1983).

Accordingly, we conclude that the District Court properly awarded the proceeds of the second Transamerica annuity to United Way and entered judgment against Merlo for the amount of that annuity paid to him.

*AFFIRMED.*

---

6. Indeed, this conclusion has essentially not been disputed by Merlo. During the proceedings before the trial court and before this Court, both Merlo and United Way have focused exclusively on the question of which party was the proper owner of the proceeds of the Mutual annuity. At no point has Merlo argued that he is entitled to ownership of the second Transamerica annuity if United Way was the owner of the proceeds of the Mutual annuity.