281 N.J. Super. 134 (1995)
656 A.2d 1267
DOMINICK J. GALLO, PLAINTIFF-APPELLANT,
v.
PRINCETON UNIVERSITY, EUGENE MCPARTLAND AND JUSTIN HARMON, DEFENDANTS-RESPONDENTS, AND THE DAILY PRINCETONIAN, THE PRINCETON ALUMNI WEEKLY, JOHN DOE, A FICTITIOUS NAME AND XYZ COMPANY, A FICTITIOUS NAME, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 7, 1994.
Decided April 7, 1995.
*136 Before Judges SHEBELL, SKILLMAN and KLEINER.
*137 Arthur Penn argued the cause for appellant (Pellettieri, Rabstein and Altman, attorneys; Mr. Penn, of counsel and on the brief).
Peter G. McDonough argued the cause for respondents (Princeton University, Office of General Counsel, attorneys; Mr. McDonough, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
This is a defamation action against Princeton University and certain of its administrators based on their statements to the media regarding an investigation into the alleged improper use of University property by University employees.
Plaintiff was employed by Princeton as the manager of plumbing and heating in its Facilities Department. After receiving an anonymous letter in the spring of 1989 alleging employee thefts and improper use of University property, the Princeton administration commenced an investigation of the Facilities Department. When plaintiff became one of the targets of this investigation, Princeton temporarily suspended him with pay. After several Princeton administrators met with plaintiff to discuss the allegations of wrongdoing against him, plaintiff submitted a letter of resignation on August 21, 1989.
Princeton's investigation of the Facilities Department and the resignations of plaintiff and two other supervisors spawned various rumors within the University community. Indeed, plaintiff characterized these rumors as "rampant." Anticipating inquiries from the press, Princeton prepared a written statement, subsequently published in the September 17, 1989 issue of the Princeton Weekly Bulletin ("Weekly Bulletin"), a University owned publication distributed to members of the faculty and administration, which stated:
An investigation over the summer into improper use of University resources in the Facilities Department has resulted in evidence that University equipment and personnel, or positions of responsibility, were used for personal gain.

*138 "We discovered, for example, that University equipment had been sent off campus to work on personal projects," said Vice President for Facilities Eugene J. McPartland. The potential losses uncovered so far are in the range of $10,000, McPartland estimated.
Three members of the Facilities staff have submitted their resignations. The investigation, which is ongoing, was requested by McPartland and is being conducted by the University's Internal Audit Office and the Department of Public Safety.
Subsequently, two independent University newspapers published stories about the investigation and resignations which are the focus of plaintiff's defamation claims. Even prior to publication of the University's statement, a reporter for the Princeton Alumni Weekly ("Alumni Weekly"), a publication distributed to Princeton alumni, learned of Princeton's investigation into improprieties in the Facilities Department and began to prepare a story. A "source" in the Facilities Department told the reporter that "three supervisors in the department had resigned after the investigation revealed that the three men had used University equipment improperly." The reporter then met with defendant Eugene McPartland, the University Vice President for Facilities, who declined to reveal the details of the investigation or to confirm the identities of the persons involved. However, McPartland did indicate that the losses were in the range of $10,000. The reporter also spoke with defendant Justin Harmon, the University's Director of Communications and Publications, who indicated that a statement about the matter would be printed shortly in the Weekly Bulletin. The reporter also met with a "senior university official," who discussed the investigation on a "not for attribution" basis. This official confirmed information previously obtained by the reporter regarding the identities of the persons who had resigned, including plaintiff. Shortly thereafter, the reporter received a copy of the Weekly Bulletin statement which he also used in his article.
The article in the Alumni Weekly, which appeared on October 11, 1989, read in pertinent part:
Three senior administrators in Princeton's grounds and building maintenance office, including the director, have resigned after an investigation into alleged abuses of their office's human and material resources. In a prepared statement, *139 the university said that the three men  later identified as Anthony F. Cifelli, the director; Dominick J. Gallo, the manager of plumbing and heating; and Raymond A. Lumio, a project manager  had used "university equipment and personnel, or positions of responsibility ... for personal gain." Because the investigation that uncovered these alleged abuses is continuing, further resignations or revelations are possible.
Eugene J. McPartland, who oversees Princeton's grounds and building maintenance operations as the vice president for facilities, estimated that the losses from this purported malfeasance were "in the range of $10,000." McPartland declined to comment on any of the specific allegations against the three men, although in the official statement he said that "we discovered, for example, that university equipment had been sent off-campus to work on personal projects." In accepting the resignations of the three officials, the university did not require them to pay any restitution, McPartland said.
The other independent University newspaper that published a story about the investigation was the Daily Princetonian, a student operated newspaper distributed to Princeton students, faculty and administrators and available by subscription to alumni, parents and other interested parties. After reading the University's statement in the Weekly Bulletin, the editors of the Daily Princetonian decided that the investigation into the operation and management of the Facilities Department would be of interest to its readers, and therefore assigned a reporter to prepare a story. The reporter interviewed McPartland, Richard Spies, the University's Vice President for Finance and Administration, and Joseph Bielamowicz, Director of Internal Audits, who was one of the primary participants in the investigation, and various lower level employees in the Facilities Department. The Daily Princetonian's article, which was published on September 28, 1989, read in pertinent part:
An ongoing investigation into alleged misuse of funds and equipment in the university's facilities departments has so far led to the resignations of three top maintenance officials for abuses costing at least $10,000.
Eugene McPartland, vice president for facilities, confirmed that an investigation of the maintenance department has resulted in the "mutually agreed upon" resignations of Anthony Cifelli, director; Raymond Lumio, project manager for roofing contracts; and Dominick Gallo, project manager for plumbing and heating.
McPartland refused to comment on many specifics of the inquiry into the maintenance department, stating that the investigation is continuing into several other facilities departments.
....

*140 McPartland also declined to elaborate on any of "at least half a dozen" initial findings of the investigation.
He did say, however, that "one of the most serious offenses" involved employees using university equipment, such as construction materials, for personal use at off-campus sites. The maintenance department has recovered all of the equipment, he said.
....
The university incurred approximately $10,000 in losses during the past three to five years because of the violations, McPartland said. The $10,000 estimate is based partly on what the equipment would have cost to rent during the time it was off campus.
He refused to comment on whether the university incurred financial losses from other infractions.
....
The university has decided not to press criminal charges for infractions discovered over the summer, McPartland said.
Administrators refused to comment on whether efforts will be made to recover financial losses.
Vice President and General Counsel Thomas Wright '62 said the university makes a "judgment call" on whether to press criminal charges in cases where university policies have been violated.
Thereafter, plaintiff filed this lawsuit against the Daily Princetonian, the Alumni Weekly, Princeton University, McPartland and Harmon. Plaintiff alleged that Princeton, McPartland and Harmon defamed him by publishing or causing to be published "a media release and other verbal and written statements to the named media defendants and other media ... indicating that plaintiff resigned from his position and ... that plaintiff had used University equipment and personnel, or positions of responsibility ... for personal gain." Plaintiff further alleged that these defamatory statements "were intended to convey, and did convey, to the public and [to] the Princeton University community that the plaintiff was and is guilty of dishonest, illegal and fraudulent conduct." Plaintiff's complaint also asserted defamation claims against the Daily Princetonian and the Alumni Weekly. In addition, plaintiff claimed that Princeton's actions constituted the intentional infliction of emotional distress and/or an invasion of *141 privacy[1] and that his resignation constituted a constructive discharge.
After substantial discovery was completed, including depositions of plaintiff, McPartland, Harmon, Spies and Bielamowicz, the trial court granted motions for summary judgment in favor of all defendants. In dismissing plaintiff's defamation claims against Princeton, McPartland and Harmon, the court found that all the statements in Princeton's September 16, 1989, release published in the Weekly Bulletin were true. In addition, the court concluded that the investigation into alleged financial improprieties in the Facilities Department was a matter of legitimate concern within the University community, and consequently Princeton and its administrators were entitled to qualified immunity from suit for defamation based upon their comments to the media. The court also concluded that even if defendants' statements contained inaccuracies, there was no evidence from which it could be found that the statements were made with knowledge of their falsity or reckless disregard for their truth or falsity.
Plaintiff does not appeal from the dismissal of his defamation claims against the Daily Princetonian and the Alumni Weekly. Plaintiff argues, however, that Princeton's prepared statement regarding the investigation of the Facilities Department published in the Weekly Bulletin and the stories published in the Daily Princetonian and Alumni Weekly were defamatory, and that the question whether Princeton, McPartland and Harmon breached a qualified privilege, assuming they had such privilege, was a question of fact which should have been decided by the jury. Plaintiff also contends that the trial court erred in dismissing his claims for invasion of privacy and constructive discharge. We reject plaintiff's arguments and affirm the dismissal of his complaint.

*142 I
"A defamatory statement is one that is false and `injurious to the reputation of another' or exposes another person to `hatred, contempt or ridicule' or subjects another person to `a loss of good will and confidence' in which he or she is held by others." Romaine v. Kallinger, 109 N.J. 282, 289, 537 A.2d 284 (1988) (quoting Leers v. Green, 24 N.J. 239, 251, 131 A.2d 781 (1957). "In certain situations, however, the public interest presents the `vital counter policy' that persons should be permitted to communicate without fear of a defamation action." Fees v. Trow, 105 N.J. 330, 336, 521 A.2d 824 (1987). The common law has accommodated these countervailing policies "by recognizing that some otherwise defamatory statements should be `privileged,' i.e., that their publication does not impose liability upon the publisher." Dairy Stores, Inc. v. Sentinel Publishing Co., 104 N.J. 125, 136, 516 A.2d 220 (1986).
"Privileges may be `absolute,' which means that the statements are completely immune, or `qualified.'" Ibid. "Because an absolute privilege protects even a maliciously-spoken untruth, it is provided only in the narrowest of instances, where the public interest in unfettered communication justifies the complete abrogation of the plaintiff's right of recovery for damaged reputation." Fees v. Trow, supra, 105 N.J. at 337, 521 A.2d 824. A "qualified privilege, on the other hand, is designed to advance the important public interest in unrestrained speech while retaining a measure of protection for the plaintiff who is maliciously defamed." Ibid. Consequently, qualified privileges are recognized in a broader range of circumstances than absolute privileges. See, e.g., Erickson v. Marsh & McLennan Co., 117 N.J. 539, 562-67, 569 A.2d 793 (1990) (qualified privilege extended to statements about employee by former employer to prospective new employer); Fees v. Trow, supra, (qualified privilege extended to statement by employee of state facility for developmentally disabled that another employee had abused resident); Dairy Stores, Inc. v. Sentinel Publishing Co., supra, (qualified privilege extended to statements by laboratory *143 that tested bottled water for newspaper reporter preparing investigative story and to statements by the newspaper that published the story); see generally 2 Fowler V. Harper, et al. The Law of Torts § 5.26 (2d ed. 1986)).
A qualified privilege, sometimes referred to as a conditional privilege, see Swede v. Passaic Daily News, 30 N.J. 320, 332, 153 A.2d 36 (1959), may be recognized for the protection of the publisher's "own interest, the interest of the recipient or other third person, or an interest common to the publisher and the recipient." Bainhauer v. Manoukian, 215 N.J. Super. 9, 36, 520 A.2d 1154 (App.Div. 1987); accord Erickson v. Marsh & McLennan Co., supra, 117 N.J. at 563, 569 A.2d 793. A qualified privilege for the protection of the publisher's own interest will be recognized "if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest." Restatement (Second) of Torts § 594. A qualified privilege for the protection of an interest common to the publisher and the recipient will be recognized "if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information another sharing the common interest is entitled to know." Restatement (Second) of Torts § 596; see Murphy v. Johns-Manville Prods. Corp., 45 N.J. Super. 478, 492-93, 133 A.2d 34 (App.Div. 1957), certif. denied, 25 N.J. 55, 134 A.2d 833 (1957). Even if a qualified privilege exists, a party may lose the privilege by "excessive publication, that is, by publishing defamatory matter without a reasonable belief `that the publication is a proper means of communicating the defamatory matter to the person to whom its publication is privileged.'" Bainhauer v. Manoukian, supra, 215 N.J. Super. at 43, 520 A.2d 1154 (quoting Restatement (Second) of Torts § 604).
Applying these principles, courts in other jurisdictions have recognized that charitable institutions and private corporations *144 have a qualified privilege to communicate with contributors, employees and other persons involved in their activities regarding alleged employee wrongdoing, and that the dissemination of information to the media may be the only effective method for such communication under some circumstances. In Merlo v. United Way of Am., 43 F.3d 96 (4th Cir.1994), the United Way discharged its Chief Financial Officer in the wake of nationally publicized allegations concerning financial improprieties, mismanagement and lavish spending by its upper management. Several weeks after discharging this official, the United Way released a report to the national news media which asserted, among other things, that "he had improperly used funds of United Way for personal reasons." Id. at 99. On appeal from a judgment in favor of United Way on the Chief Financial Officer's defamation claim, the court stated that it could reasonably be concluded that "United Way's millions of donors had a legitimate interest in the subject matter of the Report, and that publication of the Report by way of the national news media was a reasonable means of communicating the pertinent facts to this vast pool of donors." Id. at 104. Similarly, in Straitwell v. National Steel Corp., 869 F.2d 248 (4th Cir.1989), a corporation discharged several management employees who allegedly had extended favoritism to certain of its suppliers. The corporation issued a press release to local newspapers reporting the employee's discharge, which stated that "[t]he results of the investigation are sufficient to justify the termination of employment of the employees against whom the allegations had been made" but are "insufficient to pursue legal actions against the employees." Id. at 250. The court concluded that the corporation had "a qualified privilege to publicize its investigation." Id. at 251. The court also rejected plaintiff's argument that the dissemination of information concerning the investigation to the local media constituted excessive publication:
Considering the number of National employees and the population of Weirton [the town in which the corporation was located], it is apparent that the community at large was practically coterminous with the employees and their relatives and acquaintances.... Under the totality of the circumstances, we do not view as excessive its efforts to inform both its employees and their community neighbors. *145 The district court should have determined, as a matter of law, that National did not abuse its qualified privilege to issue the news release.
[Id. at 252.]
See also Richmond v. Southwire Co., 980 F.2d 518 (8th Cir.1992); Olson v. 3M Co., 188 Wis.2d 25, 523 N.W.2d 578, 582-86 (App.), review denied, ___ Wis.2d ___, 527 N.W.2d 335 (1994).
We conclude for similar reasons that the written statement published in the September 17, 1989 issue of the Weekly Bulletin, and the oral statements of McPartland, Harmon and other Princeton administrators to the reporters for the Daily Princetonian and Alumni Weekly, were entitled to qualified immunity. When these statements were made, there were already widespread rumors within the University community regarding the investigation into improprieties in the Facilities Department. Consequently, Princeton's administrators had to anticipate that they would receive inquiries regarding the investigation from the press as well as University employees, students, alumni and other interested parties. Indeed, the Alumni Weekly's reporter had already gathered substantial information regarding the investigation from other sources before the University's representatives made any statements. Therefore, the Princeton administration had an interest in informing the University community of the actual facts of the investigation rather than allowing the investigation to remain the subject of vague and exaggerated rumors which could be damaging to the University's reputation.
The members of the University community also had an important interest in obtaining information about the investigation. A large portion of the University's revenues is derived from tuition and other fees paid by students and from contributions by alumni and other supporters of the University's activities. These members of the University community have a legitimate interest in being informed of any allegations of improprieties involving the diversion of University property for private gain and of the University's response to such allegations. The University's employees also have a legitimate interest in knowing that any allegations of wrongdoing made against other employees have been *146 fairly investigated and addressed. The University's administrators have a corresponding interest in assuring the entire University community that any allegations of wrongdoing by the University's employees have been fully and fairly investigated and that, if improprieties have been found, appropriate remedial steps have been undertaken.
Moreover, the dissemination of information concerning the investigation of the Facilities Department through University publications such as the Alumni Weekly and Daily Princetonian did not constitute excessive publication. Princeton has tens of thousands of employees, students, and alumni who reside throughout the world. Therefore, the dissemination of information through University publications is the only effective method of communicating with all members of the University community.
When a statement falls within the protective umbrella of a qualified privilege, the plaintiff "must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity." Dairy Stores, Inc. v. Sentinel Publishing Co., Inc., supra, 104 N.J. at 151, 516 A.2d 220. "Reckless disregard as to truth or falsity exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of a statement." Sisler v. Gannett Co., 222 N.J. Super. 153, 162, 536 A.2d 299 (App.Div. 1987) (quoting Restatement (Second) of Torts § 600, comment b), certif. denied, 110 N.J. 304, 540 A.2d 1283 (1988). A plaintiff must prove such an abuse of a qualified immunity by "clear and convincing evidence." Erickson v. Marsh & McLennan Co., supra, 117 N.J. at 565, 569 A.2d 793.
Plaintiff failed to present any evidence in opposition to defendants' motion for summary judgment from which a jury could find that defendants made any statements which they knew to be false or that they acted in reckless disregard of their truth or falsity. Indeed, plaintiff failed to identify any false statement made by a Princeton administrator, which is the essential prerequisite of any defamation claim. See Kotlikoff v. The Community News, 89 N.J. 62, 69 n. 2, 444 A.2d 1086 (1982). Plaintiff does not dispute the *147 truth of the assertions in Princeton's prepared statement that "University equipment and personnel ... were used for personal gain," "that University equipment had been sent off campus to work on personal projects," that "potential losses uncovered so far are in the range of $10,000" or that "[t]hree members of the Facilities staff have submitted their resignations." Nor does plaintiff dispute the accuracy of the subsequent confirmation by Princeton administrators, in response to questions from the press, that he was one of the staff members who resigned.
Plaintiff argues that even if defendants did not make any express statements that were literally false, their statements describing evidence of improprieties failed to carefully distinguish among the three Facilities Department supervisors who resigned, and consequently the stories published in the Daily Princetonian and Alumni Weekly falsely implied that plaintiff himself had committed such improprieties. Plaintiff's claims rest primarily upon the statement in the Alumni Weekly article that he was one of "the three men [who] had used `university equipment and personnel, or positions of responsibility ... for personal gain," and the statement in the Daily Princetonian that he was one of "three top maintenance officials" who had resigned because of "abuses costing at least $10,000." Since the allegation that plaintiff used University equipment and personnel for personal gain is a statement of fact that would tend "to harm [his] reputation" by lowering him "in the estimation of the community" and/or by deterring others "from associating or dealing with him," Ward v. Zelikovsky, 136 N.J. 516, 529, 643 A.2d 972 (1994) (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 111 at 773 (5th ed. 1984)), and there is a factual dispute as to whether this statement and other similar statements in the two newspaper articles were false, we agree with plaintiff's contention that the statements could be found to be defamatory. However, these statements were not published by Princeton but rather by independent University newspapers, and they were not simply a republication of statements made by Princeton administrators. *148 Instead, the statements were made by the authors of the Daily Princetonian and Alumni News articles, who, relying upon the University's admittedly true statements that its investigation revealed that "University equipment and personnel ... were used for personal gain" and that plaintiff was one of the supervisors who resigned as a result of the investigation, inferred that plaintiff had used University equipment and personnel for personal gain. Therefore, the alleged defamatory statements that appeared in the independent University publications are not attributable to Princeton and its administrators.
Moreover, even if the University's statement published in the Weekly Bulletin or its administrators' later oral statements could be reasonably construed to imply that plaintiff had engaged in improprieties with respect to University property, there is no evidence that defendants knew any of their statements were false or that they acted in reckless disregard of their truth or falsity. To the contrary, Princeton's administrators acted with circumspection in all their public comments regarding the investigation of the Facilities Department, by withholding any comment regarding the matter until it was already the subject of rampant rumors within the University community and later declining to identify the persons who resigned until the reporters for the University publications had secured this information from other sources. Even after identifying these persons, the administrators declined to discuss specific employees' cases and described the resignations as "mutually arrived at decisions." The administrators also indicated in response to reporters' questions that the University had no intention to pursue criminal charges or to seek restitution.
In sum, the statements made by the University's representatives regarding the investigation of the Facilities Department served Princeton's important interest in preventing damage to its reputation within the University community which supports its activities. The University's representatives also reasonably could have believed that the University community was entitled to information concerning the alleged diversion of University property *149 for private gain, and that University publications constituted a proper means of communicating this information. Therefore, Princeton and its administrators were entitled to qualified privilege for their statements regarding the investigation. Since plaintiff failed to present any evidence from which a jury could reasonably infer that defendants knew their statements were false or acted in reckless disregard of their truth or falsity, the trial court properly dismissed plaintiff's defamation claims against Princeton, McPartland and Harmon.

II
Plaintiff's arguments relating to the dismissal of his claims for invasion of privacy and constructive discharge are clearly without merit and require only brief discussion. "[I]nvasion of privacy by unreasonable publication of private facts occurs when it is shown that `the matters revealed were actually private, that dissemination of such facts would be offensive to a reasonable person, and that there is no legitimate interest of the public in being apprised of the facts publicized.'" Romaine v. Kallinger, supra, 109 N.J. at 297, 537 A.2d 284 (quoting Bisbee v. John C. Conover Agency, 186 N.J. Super. 335, 340, 452 A.2d 689 (App.Div. 1982)). As previously discussed, Princeton's investigation into improprieties in the Facilities Department did not involve a purely private matter, and the University community had a legitimate interest in being informed of the results of that investigation. Therefore, the trial court properly rejected plaintiff's invasion of privacy claim.
Plaintiff did not have an employment contract with Princeton that included a term of employment or required Princeton to follow specified procedures before terminating him. Thus, plaintiff was an at-will employee who Princeton could have terminated at any time, with or without cause. Bernard v. IMI Sys., Inc., 131 N.J. 91, 105-06, 618 A.2d 338 (1993); Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 536 A.2d 237 (1988). Therefore, even if Princeton's investigation of the Facilities Department and plaintiff's *150 temporary suspension would have created "intolerable working conditions" had plaintiff returned to work, plaintiff had no basis for a claim of constructive discharge unless his involuntary termination would have violated anti-discrimination laws or public policy. See Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993); Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980); see also Spangle v. Valley Forge Sewer Auth., 839 F.2d 171 (3d Cir.1988); Turner v. Anheuser-Busch, Inc., 7 Cal.4th 1238, 32 Cal. Rptr.2d 223, 231, 876 P.2d 1022, 1030 (1994). Since plaintiff does not suggest that Princeton had any motivation for its investigation of the Facilities Department and plaintiff's suspension other than the proper administration of the University or that Princeton's actions violated public policy, the trial court properly dismissed plaintiff's constructive discharge claim.
Affirmed.
NOTES
[1] Although the fifth count of plaintiff's complaint appeared on its face to assert a claim solely for intentional infliction of emotional distress, the trial court treated this count as also asserting a claim for invasion of privacy. On appeal plaintiff continues to pursue a claim for invasion of privacy but has abandoned any claim for intentional infliction of emotional distress.