2009 UT 49

**Gary B. FERGUSON, Plaintiff and Appellant,**

v.

**WILLIAMS & HUNT, INC.; Elliott J. Williams; George A. Hunt; and Kurt Frankenburg, Defendants and Appellees.**

No. 20080273.

Supreme Court of Utah.

July 31, 2009.

Roy A. Jacobson Jr., Mel C. Orchard III, Jackson, WY, Charles F. Peterson, Boise, ID, Edwin S. Wall, Salt Lake City, for plaintiff.

M. David Eckersley, Salt Lake City, for defendants.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 Appellant Gary Ferguson appeals the orders of the trial court that dismissed his claims against his former law firm, Williams & Hunt, and former colleagues Elliott Williams, George Hunt, and Kurt Frankenburg (collectively, Defendants). Specifically, Mr. Ferguson asks that we reverse the directed verdict in favor of Defendants on claims of defamation and intentional interference with prospective economic relations, summary judgment in favor of Mr. Frankenburg on claims of defamation and intentional interference, and Defendants' motion in limine.

¶ 2 The claims stem from statements made by Mr. Ferguson's former partners. Mr. Williams told the firm's major client-whom Mr. Ferguson exclusively represented-that the firm had formed the belief it could not trust the accuracy of Mr. Ferguson's bills. The firm then terminated Mr. Ferguson. Months later, Mr. Frankenburg contacted Mr. Ferguson's new firm to warn that Mr. Ferguson was conflicted from certain cases. Because Mr. Ferguson failed to show that Defendants made the statement to their client knowing it was false or with reckless disregard as to its falsity, Defendants did not abuse their conditional privilege. Mr. Ferguson also failed to establish the elements for his other claims. We therefore affirm.

## BACKGROUND

¶ 3 In 1991, Gary Ferguson and his partners founded the law firm of Williams & Hunt. Mr. Ferguson worked there as a trial attorney for roughly fourteen years, specializing in medical malpractice defense for the firm's main client, the Utah Medical Insurance Association (UMIA).

¶ 4 At trial Mr. Williams testified that starting in January 2005, Mr. Ferguson began to bill more hours than he normally did. Mr. Ferguson informed his partners of his plans to take upcoming vacations in April and May to spend time with family. Previous to that year, Mr. Ferguson "was pretty steady most of the time" and never billed more than any other attorneys at the firm. But the partners "noticed a substantial change in the number of hours Gary was billing, without observing any change in his work productivity. That is, what he seemed to be doing . . . [was] the same as always, but now the hours were greater." Looking at the monthly billing summaries, Mr. Ferguson's "January numbers were off the chart. February followed, also very high. Those two months were definitely different than [the partners had] . . . ever seen before." By the end of the first quarter, Mr. Ferguson billed 130 hours more than his baseline for the two previous years, and he out-billed all of the

firm's top-billing partners, even the highest billing partner who "worked about seven days a week, most nights, all weekends." Yet the partners observed that Mr. Ferguson "never worked weekends [and] never worked evenings. [To them, t]hat was suspicious...."

¶ 5 Also early that year, Mr. Ferguson showed Mr. Williams an unusually high bill of $22,000 for one month of work on a UMIA case. In response, Mr. Williams criticized Mr. Ferguson for spending too much time preparing for a deposition. Mr. Ferguson later sent an e-mail to Mr. Williams stating that he had worked every minute billed in the case and that Mr. Williams should not criticize the time billed without knowing everything. Mr. Williams never asked Mr. Ferguson to cut the time billed.

¶ 6 Because of the high bill and the unusual number of hours, the other partners of the firm grew concerned that Mr. Ferguson was overbilling. Yet, uncertain of Mr. Ferguson's billing practices, they concluded more information was needed. This information came from a compilation of three sources: (1) a computer program, (2) Mr. Ferguson's calendar, and (3) the legal descriptions from Mr. Ferguson's billing statements.

¶ 7 The partners used these three sources to analyze Mr. Ferguson's billing practices. The computer program tracked when Mr. Ferguson logged on and off of his desktop computer. Although the new program had never been used to track time before and the firm did not require attorneys to log on and off computers at the beginning and end of each day, the attorneys at the firm, as a practical matter, logged on to their computers in the morning to get their e-mail and voice mail. The program did not track the time Mr. Ferguson spent working on his laptop or account for billable work done away from the computer, including depositions, appearances in court, or other work outside the office. To address these deficiencies, the partners verified that Mr. Ferguson did not, via laptop, check in or out any documents from their server, which tracked each time a document was entered or modified. Also, the partners obtained access to Mr. Ferguson's calendar to account for his work outside the office. Further, Mr. Ferguson's own description of the billed work "allowed them to see if it was the kind of work customarily done in the office or not."

¶ 8 Using the three sources of information, the partners began to track Mr. Ferguson's billing. On March 23, 2005, the day the computer program became active, Mr. Ferguson's calendar showed he had a medical procedure that morning. The program indicated that Mr. Ferguson logged on to his desktop around noon and that he left about five o'clock. Mr. Ferguson billed 11.25 hours that day. When asked if he worked the 11.25 hours, Mr. Ferguson testified, "I don't remember anything I did on this day, other than the ultrasound; but if I billed it, I did it, and I did it on that day." He also explained that his medical procedure that morning took only about thirty minutes to complete. Looking at his description of work, he testified that the two conferences listed required him to be in the office but that the other work could have been done away from his office. Mr. Ferguson also testified that if he anticipated doing work in the evening, "he would estimate the amount of time and enter it with that batch before [he] left [for] home."

¶ 9 On May 5, 2005, following six weeks of observation, the firm's five main partners, George Hunt, Bruce Jensen, Jody Burnett, Dennis Ferguson, and Elliott Williams, met to discuss Mr. Ferguson's billing practices. "[W]ith about 150 years of combined experience in this kind of work, [the partners] came to the inescapable conclusion that [Mr. Ferguson] was overbilling for what he was doing. It was very obvious." That same day over lunch, Mr. Williams informed the president of UMIA, Martin Oslowski, that "we had formed the belief, after reviewing the information we'd collected, that we could not trust the accuracy of [Mr. Ferguson's] bills. That was the decision we had made; and that was one of the reasons why we had to terminate his employment." At trial, Mr. Williams confirmed his belief:

Q. When you told Mr. Oslowski what you told him, did you believe it?

A. Absolutely.

The firm later credited UMIA $10,000 for the overbilling.

¶ 10 On May 5, 2005, Mr. Williams and Mr. Hunt fired Mr. Ferguson. When asked why, they told Mr. Ferguson, "We concluded that you had over-billed." Mr. Ferguson told them that "[he] had not over-billed UMIA." When Mr. Ferguson questioned what case or what day, they could not point to anything specific. Mr. Ferguson requested time to prove he had not over-billed, but they told him the decision was unanimous. When asked what they told UMIA, Mr. Williams said, "I told Marty that you can no longer trust Gary's bills." Mr. Ferguson replied that Mr. Williams had "poisoned the well at UMIA."

¶ 11 Mr. Ferguson contacted Arthur Glenn, the Vice President of Claims for UMIA, to learn if they had complained of the overbilling; they had not. Rather, Mr. Glenn, who routinely referred cases to Mr. Ferguson and reviewed all the monthly bills, never found any suspicious billing. Even after analyzing the bills a second time and creating a spreadsheet detailing Mr. Ferguson's work and time, Mr. Glenn could not "find anything unusual in the billing that [he] would consider overbilling." Mr. Ferguson asked Mr. Glenn if UMIA would ever refer another case. Mr. Glenn said it was up to Mr. Oslowski and to him "it was an issue of trust." The next day, Mr. Oslowski telephoned Mr. Glenn to tell him "we weren't to assign any more work to Gary."

¶ 12 Mr. Ferguson struggled to find work but finally gained employment with another law firm. He now works as a plaintiffs' lawyer litigating medical malpractice cases. At Williams & Hunt, Mr. Ferguson earned roughly $250,000 per year; at his current firm he has earned $1,082, $22,000, and $67,000 for the 2006, 2007, and 2008 years, respectively.

¶ 13 At his new firm, Mr. Ferguson was contacted by Kurt Frankenburg of Williams & Hunt. Mr. Frankenburg told Mr. Ferguson that under the professional rules of conduct, Mr. Ferguson was conflicted from representing clients in certain cases. One actual conflict existed; the other concerns regarding conflicts were later withdrawn.

¶ 14 Following the above events, Mr. Ferguson and his wife brought suit against Williams & Hunt and individually against Mr. Williams, Mr. Hunt, and Mr. Frankenburg seeking to recover damages for two counts of defamation, the first for Defendants' statement to UMIA, the second for Mr. Frankenburg's statement regarding conflicts; two counts of intentional interference with economic relations, the first with UMIA, the second with Mr. Ferguson's current firm; intentional infliction of emotional distress; wrongful discharge; and loss of consortium. The parties stipulated to the dismissal of the claim for loss of consortium.

¶ 15 Prior to trial Defendants filed a motion for reconsideration of a previously denied summary judgment motion. The trial court granted the motion for reconsideration in part by dismissing all claims except those against Defendants for defamation and intentional interference with prospective economic relations with UMIA. For the defamation claim, the court agreed with Defendants that a conditional privilege existed in making the statement to the client but stayed judgment to provide Mr. Ferguson the opportunity to prove abuse of the privilege. Also, the trial court granted Defendants' motion in limine to exclude evidence about the partners' alcohol consumption on the office premises, alleged affairs between firm employees, Mr. Ferguson's surgical procedure scheduled for May 6, 2005, and Mr. Ferguson's brother's suicide.

¶ 16 Upon conclusion of Mr. Ferguson's case in chief at trial, Defendants moved for a directed verdict. The trial court ruled that to prove abuse of the privilege, Mr. Ferguson had to present evidence that Defendants made the allegedly defamatory statement knowing it was false or that they acted in reckless disregard as to its falsity. The trial court examined whether sufficient evidence existed to give the case to the jury to determine that Defendants knew the statement was false or that Defendants entertained serious doubts as to the truth of the statement or that Defendants had a high degree of awareness of the probable falsity of the statement. The trial court found that no such evidence had been presented and granted Defendants' motion for directed verdict. Mr. Ferguson appealed. We have jurisdic-

tion pursuant to Utah Code section 78A–3–102(3)(j) (2008).

## ANALYSIS

¶ 17 On appeal, Mr. Ferguson presents four main issues: whether the trial court erroneously granted (1) the directed verdict as to the defamation claim; (2) the directed verdict as to the claim for intentional interference; (3) summary judgment on the claims of defamation and intentional interference in favor of Mr. Frankenburg; and (4) Defendants' motion in limine. We address each issue in turn.

## I. THE TRIAL COURT PROPERLY GRANTED THE MOTION FOR DIRECTED VERDICT ON THE DEFAMATION CLAIM

¶ 18 Mr. Ferguson argues that the trial court erred in granting the directed verdict by misapplying Utah law to require evidence that Defendants knew the statement was false or that they acted in reckless disregard as to the falsity of the statement rather than applying the lesser standard of lack of reasonable grounds.

¶ 19 The question of what standard applies to determine an abuse of privilege presents a question of law, which we review for correctness. *See O'Connor v. Burningham*, 2007 UT 58, ¶ 38, 165 P.3d 1214. "We review a trial court's grant of directed verdict for correctness." *Goebel v. Salt Lake City S. R.R. Co.*, 2004 UT 80, ¶ 10, 104 P.3d 1185. "We will sustain a directed verdict if after 'examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor.'" *Daines v. Vincent*, 2008 UT 51, ¶ 20, 190 P.3d 1269 (quoting *Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467).

### A. A Conditional Privilege is Abused by Knowledge of Falsity or Reckless Disregard as to Falsity

¶ 20 The trial court determined that Defendants, as Mr. Ferguson's employer, had a conditional or qualified privilege in making the defamatory statement to UMIA, an interested party, concerning Mr. Ferguson. Mr. Ferguson does not contest the existence of this conditional privilege. Rather, the burden having shifted from defendant to plaintiff, *see Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 58 (Utah 1991), Mr. Ferguson argues that Defendants abused and therefore lost the conditional privilege.

¶ 21 We have previously noted that a plaintiff can show abuse of a conditional privilege where a statement is made with knowledge of its falsity or with reckless disregard as to its falsity. *See O'Connor*, 2007 UT 58, ¶ 37, 165 P.3d 1214. This court also noted, " 'The publisher's lack of belief in the truth of the defamatory matter published, or his *lack of reasonable grounds for so believing* ... is important as constituting an abuse of the occasion which deprives him of the protection which it would otherwise afford.' " *Hales v. Comm'l Bank of Spanish Fork*, 114 Utah 186, 197 P.2d 910, 913 (1948)(quoting Restatement of Torts § 594 cmt. b (1938))(emphasis added).[1] Mr. Ferguson asks that we abide by our dicta in *Hales* and allow him to show Defendants lacked reasonable grounds for their statement, and as a result abused their conditional privilege. Given the changes in defamation law since the 1938 publication of the Restatement of Torts, which we relied on in *Hales* and from which the lack of reasonable grounds standard is derived, 197 P.2d at 913, we can no longer abide by prior pronouncements.

¶ 22 The Supreme Court of the United States altered the landscape of defamation law with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686

---

1. A conditional privilege may also be abused by a showing that "the defendant acted with malice or that the publication of the defamatory material extended beyond those who had a legally justified reason for receiving it." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 58 (Utah 1991). This common law malice, which shows an improper motive of spite or ill will, is distinct from the actual malice standard of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See Cox v. Hatch*, 761 P.2d 556, 559 n. 3 (Utah 1988). Our analysis does not address common law malice or excessive publication, and we thus leave them as means by which a plaintiff can prove abuse of a conditional privilege.

(1964). There, the Court determined that the free speech rights of the First Amendment prohibited a public official from recovering on a defamation claim under state law unless the official proved the statement was made with actual malice, that is, knowing it was false or with reckless disregard as to its falsity. *Id.* at 279–80, 84 S.Ct. 710. A decade later, the Supreme Court further altered state defamation law. In *Gertz v. Robert Welch, Inc.,* the Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U.S. 323, 347, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court further held that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Id.* at 349, 94 S.Ct. 2997.

¶ 23 The Restatement (Second) of Torts recognizes the impact of *Gertz* on state defamation law and, in particular, conditional privileges. The Restatement explains that because of *Gertz,* "strict liability in defamation is unconstitutional and that a publisher can be held liable only if he was at least negligent regarding the falsity of the statement." Restatement (Second) of Torts § 600 cmt. a (1977). Thus, "mere negligence as to falsity, being required for all actions of defa-

mation, is no longer treated as sufficient to amount to abuse of a conditional privilege." *Id.* cmt. b. Accordingly, the Restatement no longer recognizes the once majority rule of lack of reasonable grounds; instead, "one who upon an occasion giving rise to a conditional privilege publishes false and defamatory matter concerning another abuses the privilege if he (a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity." [2] *Id.* § 600. Since the publication of the Restatement (Second) of Torts, several courts have followed suit. [3]

¶ 24 We agree with the rationale set forth by section 600 of the Restatement (Second) of Torts. If *Gertz* requires a private plaintiff to prove that a defendant negligently published a defamatory statement regarding a private concern, then lack of reasonable grounds—or in other words, negligence—loses its significance in the conditional privilege setting. The lack-of-reasonable-grounds standard would offer no more protection to a privileged statement than exists in a purely private defamation action. We recognize that our cases have indicated, in dicta, that in a purely private defamation action the requisite degree of fault is negligence. [4] However, while these cases accord with the rationale of the Restatement (Second) of Torts, this proposition of negligence stems from those cases involving a private plaintiff *and* a public concern, in which negligence is clearly required to establish a claim for defamation. [5] Conse-

---

**2.** Rather than referring to knowledge of falsity and reckless disregard as to falsity in terms of actual malice, the Restatement divides this concept in the two distinct standards for abuse of a conditional privilege. We do the same to avoid the confusion sometimes created by use of the terms actual malice and common law malice.

**3.** *See Lyons v. Nat'l Car Rental Sys., Inc.,* 30 F.3d 240, 244 (1st Cir.1994); *Esmark Apparel, Inc. v. James,* 10 F.3d 1156, 1163 (5th Cir.1994); *Green Acres Trust v. London,* 141 Ariz. 609, 688 P.2d 617, 624 (1984); *Dominguez v. Babcock,* 727 P.2d 362, 366 (Colo.1986); *Dobbyn v. Nelson,* 2 Kan.App.2d 358, 579 P.2d 721, 725 (1978); *Kennedy v. Sheriff of E. Baton Rouge,* 935 So.2d 669, 684–86 (La.2006); *Gallo v. Princeton Univ.,* 281 N.J.Super. 134, 656 A.2d 1267, 1274 (App.Div. 1995); *Bender v. City of Seattle,* 99 Wash.2d 582, 664 P.2d 492, 505 (1983).

**4.** *See, e.g., DeBry v. Godbe,* 1999 UT 111, ¶ 8, 992 P.2d 979 (listing publication "with the requisite

degree of fault" as an element in establishing a claim for defamation in a purely private context); *Oman v. Davis Sch. Dist.,* 2008 UT 70, ¶¶ 68–70, 194 P.3d 956 (noting fault as an element in a purely private context and remarking that a school district maintenance coordinator had not demonstrated negligence in his defamation action against the employer school district).

**5.** For example, in support of its proposition, *De-Bry,* 1999 UT 111, ¶ 8, 992 P.2d 979, cited to *West v. Thomson Newspapers,* 872 P.2d 999, 1007–08 (Utah 1994), which involved the mayor of a small, southern Utah town about whom a local newspaper allegedly published defamatory statements. *See West,* 872 P.2d at 1000. Similarly, *Oman,* 2008 UT 70, ¶ 69, 194 P.3d 956, cited to *Wayment v. Clear Channel Broad., Inc.,* 2005 UT 25, ¶ 32 n. 13, 116 P.3d 271, for the proposition that "a defamation plaintiff who is not a public figure must ... [still] establish negligence on the part of the defendant," which prop-

quently, we have not directly decided the degree of fault necessary, if any, in a purely private defamation action. We expressly so note because we recognize that the rationale of the Restatement may be based on an overbroad reading of *Gertz*.

¶ 25 Since the publication of the Restatement (Second) of Torts in 1977, some uncertainty has arisen as to the applicability of *Gertz* for defamation actions brought in a purely private context. Roughly a decade after *Gertz*, the Supreme Court in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* ruled by plurality opinion that a private plaintiff's recovery of "presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern." 472 U.S. 749, 763, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985); *id.* at 763–64, 105 S.Ct. 2939 (Burger, C.J., concurring); *id.* at 774, 105 S.Ct. 2939 (White, J., concurring). A four-justice dissent criticized the plurality for failing to attribute any free speech interests to the statement, and it would have applied *Gertz* to require the private plaintiff to show negligence to establish the defamatory claim and actual malice to receive presumed or punitive damages. *Id.* at 775–76, 105 S.Ct. 2939 (Brennan, J., dissenting). In *Cox v. Hatch*, this court noted the impact of this plurality decision: "If the defamatory falsehood does not relate to a matter of 'public concern,' state law could constitutionally continue to apply the common law doctrine of strict liability in a defamation action." 761 P.2d 556, 559–60 (Utah 1988). But *Cox* left open the question of *Gertz's* applicability in the purely private context. *See id.* at 560–61 (finding a public concern and resolving the case where plaintiff failed to state a claim).

¶ 26 Again, we leave open this question regarding strict liability in a purely private defamation action. Although this issue could be implied from the assumption in the Restatement (Second) of Torts that *Gertz* eliminated strict liability in all defamation actions, that question is not before us and we need not rely solely on that reasoning. Rather, we are faced with a question regarding the abuse of a conditional privilege. Though this privilege may not present the panoply of First Amendment interests of a constitutional privilege, it is a privilege that affords its publisher a level of protection in making certain statements to certain individuals.

¶ 27 A conditional privilege arises to protect a legitimate interest of the publisher, the recipient, or a third person. *See Brehany*, 812 P.2d at 58. "The privilege also extends to statements made to advance a legitimate common interest between the publisher and the recipient of the publication." *Id.* Thus, "[t]his qualified privilege protects an employer's communication ... to other interested parties concerning the reasons for an employee's discharge." *Id.* Were statements not so privileged, a chilling effect would harm legitimate interests, including those at stake here, in candor, lawyer representation, and fiduciary duties or responsibilities. The conditional privilege also permits mistakes to be made; otherwise, there would be no need for the privilege. *See, e.g., id.* (noting that a conditional privilege is "regarded as being sufficiently important to justify some latitude for making mistakes" (internal quotation marks omitted)). And while we recognize that, "[a]t its core, an action for defamation is intended to protect an individual's interest in maintaining a good reputation," *West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994), the reality of the privilege means defamatory statements will be made for which an injured plaintiff will not be able to recover damages. Thus, in balancing the justification for the privilege against the individual's interests in reputation, the necessity of deeming certain statements privileged requires some room for honest error, but not for known falsity or recklessness.

¶ 28 Accordingly, we abandon the lack-of-reasonable-grounds standard. We now clarify that in addition to other common law means, such as excessive publication or common law malice, a plaintiff can show

osition *Wayment* attributes to *Seegmiller v. KSL, Inc.*, 626 P.2d 968 (Utah 1981), a case involving a private plaintiff and a media defendant. *See Seegmiller*, 626 P.2d at 973.

abuse of a conditional privilege where the defendant (1) made a defamatory statement knowing it to be false or (2) acted in reckless disregard as to its falsity. With the standards for abuse clarified, we turn to the evidence presented at trial.

### B. Mr. Ferguson Failed to Present Evidence Showing that Defendants Knew the Statement Was False or Acted in Reckless Disregard as to Its Falsity

¶ 29 To prove abuse of the privilege, the trial court correctly required Mr. Ferguson to present sufficient evidence that Defendants knew the statement to UMIA was false or acted with reckless disregard as to its falsity. This Mr. Ferguson did not do.[6]

¶ 30 A publisher's knowledge of the falsity of a statement is inherently subjective. To prove knowledge of falsity, a plaintiff must present evidence that shows the defendant knows the defamatory statement is untrue. Likewise, acting with reckless disregard as to the statement's falsity involves a showing of subjective intent or state of mind. The Restatement explains that reckless disregard as to falsity "exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement." Restatement (Second) of Torts § 600 cmt. b (1977); *see also St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."). But while reckless disregard is substantially subjective, certain facts may show, regardless of the publisher's bald assertions of belief, that "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circu-

lation" or that "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant,* 390 U.S. at 732, 88 S.Ct. 1323. Therefore, reckless disregard as to the falsity of statement that a defendant honestly believed to be true is determined by a subjective inquiry as to the defendant's belief and an objective inquiry as the inherent improbability of or obvious doubt created by the facts.[7]

¶ 31 Here, Mr. Ferguson presented no evidence to meet the standard. Rather, the evidence presented in his case in chief revealed that Defendants believed the truth of their statement concerning Mr. Ferguson's billing. Defendants' suspicions arose when, early in the year, Mr. Ferguson began to bill more hours than he ever had before; he outbilled the firm's traditional highest-billing attorneys and did so with out any apparent change in his work habits. Had Defendants made the statement to UMIA at this point, the conclusion might be that despite their suspicions, Defendants entertained serious doubts given that they knew of Mr. Ferguson's upcoming vacations. But Defendants did not do this; instead, to determine the validity of Mr. Ferguson's billing practices, Defendants used three sources of information: the computer tracking program, Mr. Ferguson's calendar, and the legal descriptions from his billing statements. Together, these sources revealed what Defendants believed to be improper billing practices by Mr. Ferguson. With this belief, Defendants, acting pursuant to their conditional privilege, made the statement to UMIA.

¶ 32 In response to this evidence, Mr. Ferguson offered his own testimony that when he was terminated and told of the reason why, he informed Defendants that he

---

**6.** Mr. Ferguson does not argue excessive publication as a ground for abuse, but he does argue common law malice in that Defendants acted with common law malice by terminating him the day before a scheduled surgery to remove a suspected cancerous thyroid. Even if this act of termination, done separately from the publication of the defamatory statement, demonstrated ill will, the trial court excluded this evidence by granting Defendants' motion in limine. Thus this evidence was never introduced at trial. *See infra* Part IV. Therefore, as the trial court found

and as we agree, Mr. Ferguson presented no evidence of ill will at trial.

**7.** Insofar as a defendant makes a defamatory statement that it "reasonably believed" or "did not reasonably believe" to be true, *see Wayment v. Clear Channel Broad., Inc.,* 2005 UT 25, ¶¶ 53–54, 116 P.3d 271, that belief is likewise measured against the standard of reckless disregard for these subjective and objective inquiries, and not, as we discussed above, the grounds that would make a belief reasonable.

did not overbill. Mr. Ferguson also attacked the reasonableness of Defendants' investigation, pointing out that: the computer program failed to take into account legitimate billable work done away from the desktop computer; the investigating partners failed to confront Mr. Ferguson about the overbilling until after they made the statement to UMIA; Defendants could not point to any specific incident of overbilling; and UMIA's claim manager, Mr. Glenn, never found anything unusual about the billing.

¶ 33 While there may be questions about the adequacy of Defendants' investigation and what, in hindsight, may appear to have been a premature and possibly even erroneous conclusion, the evidence does not satisfy the standard of abuse required for the conditional privilege. Neither Mr. Ferguson's own testimony nor his evidence of an inadequate investigation show that Defendants made the statement to UMIA knowing it was false or that they acted with reckless disregard as to its falsity. The evidence does not show that Defendants entertained serious doubts of the statement's falsity or that they had a high degree of awareness of its falsity; rather, based on the three sources of information, Defendants made the statement believing it to be true. The fact that Defendants refunded $10,000 in fees to UMIA bolsters this conclusion. Nor does the evidence present facts that show the statement was inherently improbable or that an obvious reason existed to doubt the veracity of the statement. We therefore hold that the trial court properly granted Defendants' motion for directed verdict as to the defamation claim.

## II. THE TRIAL COURT PROPERLY GRANTED THE MOTION FOR DIRECTED VERDICT ON THE INTENTIONAL INTERFERENCE CLAIM

¶ 34 Mr. Ferguson also argues that the trial court erred in granting the directed verdict as to the claim of intentional interference with prospective relations in regards to UMIA. We disagree.

¶ 35 Utah law recognizes a common law cause of action for intentional interference with prospective economic relations. *Leigh Furniture & Carpet Co. v. Isom*, 657

P.2d 293, 304 (Utah 1982). " '[I]n order to recover damages, the plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff.' " *Overstock.com, Inc. v. Smart-Bargains, Inc.*, 2008 UT 55, ¶ 18, 192 P.3d 858 (alteration in original) (quoting *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991)). The second element offers two alternatives. To establish the first alternative, improper purpose, the plaintiff must prove more than a defendant's motivation of ill will toward the plaintiff; "[r]ather, the plaintiff must show that the defendant's 'predominant purpose was to injure the plaintiff.' " *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 20, 116 P.3d 323 (quoting *Leigh Furniture & Carpet Co.*, 657 P.2d at 307). "To establish the second alternative, improper means, a plaintiff must show 'that the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession.' " *Id.* (quoting *Pratt v. Prodata, Inc.*, 885 P.2d 786, 787 (Utah 1994)).

¶ 36 At trial, Mr. Ferguson failed to establish the second element. Mr. Ferguson predicated his intentional interference claim on the alleged defamation in this case-that Defendants used an improper means by defaming Mr. Ferguson's professional reputation with UMIA. Defamation would be a means contrary to the common law. However, our holding above, which affirms the trial court's grant of the directed verdict, dictates that no defamation existed, and thus Defendants employed no improper means. And besides Mr. Ferguson's conclusory assertion that the statement to UMIA was motivated out of spite and ill will, we are not directed to and cannot find any evidence to that effect, let alone evidence that injury to Mr. Ferguson was Defendants' predominant purpose. We therefore affirm the trial court's grant of the directed verdict.

## III. THE TRIAL COURT PROPERLY ENTERED SUMMARY JUDGMENT IN FAVOR OF DEFENDANT FRANKENBURG

¶ 37 Prior to trial, the lower court granted, in part, Defendants' motion for reconsidera-

tion. In granting the motion, the trial court entered summary judgment in favor of defendant Mr. Frankenburg by dismissing the claims of defamation and intentional interference with economic relations. Mr. Ferguson argues that the entry of summary judgment was procedurally and substantively incorrect. Again, we disagree.

¶ 38 In reviewing a district court's grant of summary judgment, we review the lower court's legal conclusion for correctness, granting no deference therein, and "review the facts and all reasonable inferences in the light most favorable to the nonmoving party." *S. Utah Wilderness Alliance v. Automated Geographic Reference Ctr.*, 2008 UT 88, ¶ 12, 200 P.3d 643. We will affirm the granting of summary judgment "only in the absence of any genuine issue of material fact and where the moving party is entitled to judgment as a matter of law." *Id.; see* Utah R. Civ. P. 56(c).

¶ 39 Mr. Ferguson contends first that the trial court lacked authority to consider the motion for summary judgment because it was brought as part of a motion for reconsideration of summary judgment outside the scheduling order of the case. Implicit in this contention is the pretrial nature of the motion.

¶ 40 A district court has the discretionary power to reconsider or decline to reconsider its decisions within a case before entering final judgment. *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 27, 196 P.3d 588; *see also Gillett v. Price*, 2006 UT 24, ¶ 10, 135 P.3d 861 (recognizing a district court's discretion to reconsider its decisions prior to final judgment). As rule 54(b) of the Utah Rules of Civil Procedure provides, where multiple claims and multiple parties are involved, any order of the court, in the absence of a final judgment, "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Because of the multiple claims and parties at issue here and the lack of a final judgment, the trial court could reconsider its earlier summary judgment ruling.

¶ 41 Mr. Ferguson next contends that genuine issues of material fact precluded summary judgment. However, Mr. Ferguson points to no contested facts. The factual basis underlying these defamation and intentional interference claims stems from UMIA turning Mr. Ferguson's caseload over to Mr. Frankenburg after the termination and from Mr. Frankenburg contacting Mr. Ferguson's new law firm to inform them of potential conflicts Mr. Ferguson might have. Defendants did not dispute these facts; rather, they showed that Mr. Ferguson acknowledged in his deposition that the statements regarding potential ethical conflicts were not defamatory. Mr. Ferguson also admitted in his deposition that at least one express conflict existed and the questions regarding the other potential conflicts were legitimate.

¶ 42 The legitimacy of these concerns precluded Mr. Ferguson from proving either claim. Mr. Ferguson cannot prove defamation because the concerns regarding ethical conflicts were either true or legitimately raised. "In this state, truth is an absolute defense to an action for defamation." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57 (Utah 1991). Neither can Mr. Ferguson prove intentional interference as he, again, cannot establish the element of improper means or improper purpose. *See Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 18, 192 P.3d 858. A legitimate inquiry regarding ethical conflicts is not improper means. Protecting the legitimate interests of a firm's client, without evidence of predominating ill will, is not an improper purpose. The trial court thus did not err procedurally or substantively in granting Defendants' motion for reconsideration and entering summary judgment in favor of defendant Frankenburg.

IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN GRANTING DEFENDANTS' MOTION IN LIMINE

¶ 43 The final issue is whether the trial court abused its discretion in granting Defendants' motion in limine. By granting the motion, the trial court excluded evidence on four matters: the drinking practices at the firm's office, allegations of affairs within

the firm, Mr. Ferguson's medical procedure, and the suicide of Mr. Ferguson's brother. In reviewing "the exclusion of evidence, we grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion" and will thus "not reverse a trial court's ruling on evidence unless the ruling 'was beyond the limits of reasonability.'" *Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269 (quoting *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 57, 82 P.3d 1076). Because the trial court did not abuse its discretion in determining such evidence was irrelevant and unduly prejudicial, we uphold its ruling.

¶ 44 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. Relevant evidence is admissible; irrelevant evidence is not admissible. *Id.* 402.

¶ 45 The relevance of Mr. Ferguson's evidence to show Defendants' ill will or spite is questionable. Mr. Ferguson argues that Defendants showed their ill will by firing him despite knowing that he was very apprehensive about a surgery scheduled for the next day. Mr. Ferguson also claims that Defendants fired him knowing that his brother had committed suicide after being terminated from his job as a nurse anesthetist. This evidence regarding the timing and act of the termination does not go to the issue of whether Defendants acted with common law malice in making the allegedly defamatory statement to UMIA—an act done apart from and before Mr. Ferguson's termination. This evidence is therefore irrelevant under rule 401 and inadmissible under rule 402.

¶ 46 Similarly, the evidence of Mr. Ferguson's discussions with the firm regarding members' alcohol use and extramarital affairs raise questions of relevancy. Mr. Ferguson argues that his requests that the partners stop consuming "so much alcohol during work hours" and that the firm implement a sexual harassment policy due to an extra-marital affair between a partner and a subordinate were the reasons for his termination. Mr. Ferguson again fails to link this evidence to the act of defamation, especially considering that Mr. Ferguson admitted in his deposition that he never voiced opposition to the firm's drinking practices and that the extra-marital affair did not involve the partner who made the statement to UMIA. Even assuming the evidence bears some minor probative value, however, the issue is resolved by the trial court's exclusion of the evidence under rule 403.

¶ 47 Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* 403. In undertaking this rule 403 weighing, a trial court must be mindful that "almost all evidence is [prejudicial]." *Robinson v. All–Star Delivery, Inc.*, 1999 UT 109, ¶ 28, 992 P.2d 969. This is particularly true in regards to evidence of common law malice necessary to prove abuse of a conditional privilege. Ill will or spite always places a defendant in a bad light. And although prejudicial, this result may not be unfair. A trial court should thus take this context into consideration in weighing probative value against unfair prejudice, otherwise "hardly any evidence of [ill will or spite] would be admissible." *Id.*

¶ 48 Here, given the nominal, if any, probative value of the evidence, the trial court did not abuse its discretion in excluding the evidence under rule 403. Doubting the probative value of this evidence, the trial court weighed it and found that it "could easily lead this jury to be wrongfully prejudiced or biased against the defendants because they consume alcohol at their place of work, or because there may be alleged affairs at their place of work." The trial court also concluded that "[p]laintiff's medical procedure [and] plaintiff's brother's suicide, clearly . . . can mislead the jury, and may very well wrongfully inflame the jury's sympathy in favor of the plaintiff[ ] and against the defendants in this case." Therefore, we uphold the trial court's grant of Defendants' motion in limine.

## CONCLUSION

¶ 49 We hold that the trial court properly granted the directed verdict as to the defa-

mation claim where Mr. Ferguson failed to present sufficient evidence that Defendants abused their conditional privilege by making the defamatory statement knowing of its falsity or acting with reckless disregard as to its falsity. We also hold the trial court properly granted the directed verdict as to the intentional interference claim because no defamation and thus no improper means existed in light of the conditional privilege, and there was no evidence of an improper purpose. Similarly, the trial court properly granted summary judgment in favor of defendant Frankenburg where legitimate concerns of ethical conflicts prevented the showing of defamation or intentional interference. Lastly, we hold that the trial court did not abuse its discretion in granting Defendants' motion in limine where it excluded the evidence on the grounds of relevancy and undue prejudice. Accordingly, we affirm the orders of the trial court.

¶ 50 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM'S opinion.