**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 16, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KT GROUP, LLC; EAGLE
MOUNTAIN PARTNERS, LLC,

      Plaintiffs - Appellants,

      v.

CHRISTENSEN, GLASER, FINK,
JACOBS, WEIL & SHAPIRO, LLP;
ROGER HOWARD, an individual;
JOSEF BOBEK, an individual; JERRY
KATZ, an individual,

      Defendants - Appellees.

No. 10-4194

(D.C. No. 2:07-CV-00790-DB)

(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **HOLLOWAY**, and **HARTZ**, Circuit Judges.

## I. Introduction

In 2006, North Silver Lake Lodge, LLC ("NSLL") and plaintiff-appellant

KT Group entered into a purchase agreement to sell property located near the

Deer Valley Resort in Park City, Utah, (the "Property") for $30 million. NSLL

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

was one of over 150 companies created and controlled from 1990 to 2006 by Val Southwick in furtherance of an extensive Ponzi scheme, which resulted in his eventual felony convictions. As the parties to the purchase agreement proceeded to closing, Covenant Group, a collection of real estate development companies which had dealt with Southwick on a number of other investment projects for many years, demanded repayment from escrow for two loans it had made to Southwick entities in connection with the Property. These demands ultimately thwarted the sale because the demands on the escrow exceeded the purchase price of the Property. Throughout the relevant time period, Covenant Group was represented by defendant-appellees Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP and attorneys Roger Howard, Josef Bobek, and Jerry Katz (the "CG Defendants"). KT Group brought suit against the CG Defendants, alleging intentional interference with contractual relations and civil conspiracy. The district court granted summary judgment to the CG Defendants on both claims, concluding their actions were not "improper" as a matter of law and their actions were privileged because they took place within the scope of the attorney-client relationship. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms**.

II.    **Background**

Southwick, acting through NSLL, purchased the Property for $12 million in 2001. The Property was subject to a $12 million first mortgage in favor of U.S.

-2-

Bank. In his efforts to further develop the Property, Southwick obtained two loans from the Covenant Group. The first loan, in the amount of $2.6 million, was made to Five Star Lending, LLC ("Five Star"), a Southwick entity which held a second mortgage on the Property. The Five Star loan was secured by a fractional interest in Five Star's second mortgage. The second loan was made to 7101 Silver Lake, LLC ("7101"), another Southwick entity, for $9.7 million to prevent foreclosure on the Property by its previous owner, Harrison Horn. In exchange for the 7101 loan, Southwick promised to subdivide a portion of the Property known as the Cottage Lots and pledge a deed of trust in favor of Covenant Group securing the 7101 loan with the Cottage Lots. Southwick caused NSLL and 7101 to enter into a purchase and sale agreement in 2005, pursuant to which NSLL agreed to convey the Cottage Lots to 7101 for $9.7 million. Further, on November 10, 2005, Southwick, through 7101, executed a deed of trust in favor of Covenant Group giving Covenant Group a security interest in the Cottage Lots. Ultimately, the deed of trust was never recorded on the advice of Southwick's attorney, who believed recording the deed would adversely affect NSLL's ongoing efforts to develop the Property with Ritz Carlton. A deed of trust between NSLL and Covenant Group purporting to secure the $9.7 million note with the Cottage Lots was also prepared, but never signed.

On May 8, 2006, NSLL agreed to sell the Property to KT Group for $30 million. The agreement identified both NSLL and 7101 as sellers of the Property,

noting "NSL[L] is the record owner, but 7101 . . . is the beneficial owner of the portion of the Property described as [the Cottage Lots]." Stewart Title Guaranty Company was the escrow agent retained to close and insure the sale of the Property, and a target closing date was set for November 13, 2006. On September 20, 2006, the CG Defendants sent an "Escrow Demand" letter to Stewart Title. The letter demanded repayment of the Five Star loan, the 7101 loan, and the Kenton loan.[1] Because Covenant Group's demands exceeded the funds in escrow, the sale was stalled.

In early October, 2006, Southwick requested beneficiary statements from each of the sixty-two sub-lenders of the Five Star Mortgage. All but five signed and returned the statements, waiving their rights to interest payments after May, 2006. Four of the five lenders who did not return the statements were Covenant Group entities. For the next six months, the CG Defendants negotiated with Southwick's attorneys regarding what consideration Covenant Group would accept for waiver of its 7101 rights and Kenton rights. The CG Defendants, by email on November 9, 2006, clarified that their escrow demands had not been rescinded and Covenant Group was not ready to release the Five Star beneficiary statements. The sale did not close as scheduled on November 13. On November 14, 2006, the CG Defendants sent an "Amended Escrow Demand," which still

---

[1] The Kenton loan was an unsecured $4 million loan from Covenant Group to another Southwick entity, Kenton Investments, LLC.

demanded repayment of the Five Star and 7101 loans, but no longer demanded

repayment of the Kenton loan. The escrow agent replied by email:

> To All:
>
> I am in receipt of a revised Escrow Demand (copy attached) which now is placing a demand on this escrow for additional accrued interest on the funds we are allocating to certain sub-lenders under the Five Star loan and demanding payment for an unsecured loan from 7101 Silver Lake, LLC. This entity was never in title and as such any loan from them to additional lenders is not a recorded lien against the property.
>
> This escrow is in a position to pay to certain sub lenders of the Five Star loan the funds they agreed was [sic] owed to them pursuant to payoff letters signed by them (copies attached) in the total amount of $2.6 Million. Also, all sub lenders under the Five Star loan executed a Loan Management Agreement with Five Star that it could reconvey the Deed of Trust upon on agreed payoff number which number on the 10/26/06 closing statement was $14,279,617.17. The payoff amount due to Five Star is being distributed from this escrow directly to all of the sub lenders per their executed and notarized payoff letters. This amount will not be paid to any outside party as your Demand Letter seems to dictate.
>
> Each day that now passes while this escrow awaits the receipt of the original payoff statements from Covenant/Heritage Orcas sub lenders, decreases any amount the Seller may receive from the closing. Daily interest is accruing on the US Bank loan, the delinquent taxes and the Mechanic's lien. As you can easily see, there are no funds available to pay any unsecured lien, to pay additional interest to any of the sub lenders, nor to pay any attorney fees. If there is a payoff due from the Seller for an unsecured lien and/or attorney fees due with respect to that lien, then those matters need to be handled with the Seller outside of this escrow.
>
> The Buyer is ready, willing and able to fund and instruct her Lender to fund this escrow so that we can close. I need the original Beneficiary payoff statements in my hand before I tell her to fund. All we are waiting for is to know that all issues are resolved as far as

this closing is concerned with the Covenant/Heritage Orcas sub lenders and that they accept the total payment of $2.6 Million.

Hours later, the CG Defendants responded with their own email:

> The purpose of this e-mail is to clarify certain statements in your e-mail.
>
> (1) Our demand is for principal and accrued interest under the secured Five Star loan and the unsecured [7101 loan] (which was to be secured by a deed of trust, which was never recorded).
>
> (2) The Beneficiary Statements have never been released or submitted to escrow.
>
> (3) Our clients' demand has always included principal and interest due and owing under the [7101 loan].
>
> [4] Our clients' demand does not include attorney's fees or legal costs.

Almost immediately, the escrow agent responded. In response to the CG Defendants' first numbered statement, she stated, "The interest of 7101 . . . (if any) is only reflected in [KT Group's agreement to purchase the Property]—not of County record. Therefore, this is an unsecured loan and between the Seller and your clients—not escrow on this sale."

Two days later, the CG Defendants delivered to the escrow agent all of the beneficiary statements in their possession (four for the Five Star loan and two for the 7101 loan). Enclosed with the statements was a letter, which read in part:

> Please be advised that your closing escrow and reconveying the Five Star Lending, LLC, deed of trust without both paying all sums due Covenant as set forth in the enclosed Beneficiary Statement will cause Covenant substantial damages, for which we shall hold Escrow

Holder and Stewart Title Company liable for [sic]. If you believe the Loan Management Agreement grants you and Stewart Title the authority to close escrow and not pay all funds due and owing to Covenant, then you are proceeding at your own risk and we will hold all parties responsible for any damages incurred by Covenant.

The assertion of the 7101 loan caused the amounts claimed against the escrow to exceed the purchase price of the Property. As a result, escrow was terminated on November 20, 2006. KT Group brought suit against the CG Defendants on October 15, 2007, alleging intentional interference with economic relations and civil conspiracy. The district court granted summary judgment to the CG Defendants on both claims, and KT Group appeals.

## III. Discussion

This court reviews the grant of summary judgment de novo, applying the same standard as the district court. *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and draw inferences in the light most favorable to the nonmoving party. *Lundstrom*, 616 F.3d at 1118. Failure of proof of an essential element of a claim renders all other facts immaterial. *Koch v. Koch Indus.*, 203 F.3d 1202, 1212 (10th Cir. 2000).

To prevail on a claim of intentional interference with economic relations under Utah law, the plaintiff must prove "(1) that the defendant intentionally

-7-

interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982). The second element of the tort can be proved in one of two ways. To prove the defendant acted with an improper purpose, the plaintiff must show the predominant purpose of the defendant was to injure the plaintiff. *Ferguson v. Williams & Hunt*, 221 P.3d 205, 216 (Utah 2009). To prove the defendant acted by improper means, the plaintiff must show "the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession." *Id.* (quotations omitted).

Before the district court, counsel for KT Group acknowledged it lacked sufficient basis to allege the CG Defendants' predominant purpose was to harm KT Group and opted to proceed under the improper means theory. Additionally, the parties agreed that the disposition of the case ultimately turned on whether the CG Defendants' assertion of the 7101 loan against the Property constituted improper means. The district court concluded, *inter alia*, that it did not. Before the district court, KT Group argued the improper means employed by the CG Defendants included the misuse of a valid lien, violation of Rule 4.4(a) of the Utah Rules of Professional Conduct, wrongful appropriation, extortion, slander of title, and violation of a common law rule of conduct set forth in the Restatement (Third) of Property: Mortgages, § 1.6. On appeal, however, as counsel for KT

Group acknowledged at oral argument, KT Group develops only the first of these theories. KT Group thus argues the improper means used by the CG Defendants consisted of attempting to secure payment of the allegedly unsecured 7101 loan for their clients by refusing to release the indisputably secured Five Star loan. While KT Group's briefs also contain a handful of isolated references to other allegedly improper means, such as slander of title[2] and extortion[3], these "perfunctory and cursory" references to legal argument are insufficiently

---

[2]KT Group's Opening Brief contains three references to a possible "slander of title" theory. Two of the three references appear in KT Group's recitation of the facts and are unaccompanied by any developed argumentation. The third reference occurs in the course of KT Group's argument that the CG Defendants' conduct was not privileged. KT Group cites *Olsen v. Kidman*, 235 P.2d 510, 512–13 (Utah 1951), wherein a real estate broker who wrongfully recorded a lien for commissions was held liable for slander of title, notwithstanding his having reasonable grounds to believe he had a right to a lien. KT Group does not use *Olsen* to contend the CG Defendants slandered title to the Property. Instead, *Olsen* is cited for the proposition that Utah courts disapprove of conduct which shifts from one party to another the burden of seeking court relief. *See id.* at 512. Even with respect to this proposition, the argument is unpersuasive. Unlike the real estate broker in *Olsen*, the CG Defendants never attempted to record a lien against the Property. Therefore, far from shifting the Covenant Group's burden to seek judicial relief onto KT Group, the CG Defendants acknowledged that the sale of the Property could proceed but reserved their clients' rights to sue for damages in the event it did.

[3]KT Group's Opening brief contains five brief references to an "extortion" theory, only three of which appear in the "Argument" section of its brief. KT Group does not set forth the elements of a potential extortion theory until its reply brief, and even then does so only in a footnote which makes no effort to demonstrate how the CG Defendants' actions satisfied those elements. This argument therefore need not be considered. *See Aviva Life & Annuity Co. v. FDIC*, 654 F.3d 1129, 1136 n.6 (10th Cir. 2011).

developed to be considered on appeal. *See United States v. Almaraz*, 306 F.3d 1031, 1041 (10th Cir. 2002); Fed. R. App. P. 28(a)(9)(A).

The parties vigorously dispute whether the 7101 loan was actually secured by the Property. The CG Defendants argue Southwick's unfulfilled promise to record a security interest in exchange for the 7101 loan created an equitable lien in favor of the Covenant Group. KT Group contends an equitable lien encumbering real property cannot come into existence absent a court order, and that Southwick's promise to record a lien on behalf of 7101 cannot encumber the Property because 7101 never held a pledgeable interest in the Property. In their responsive brief, the CG Defendants argue, *inter alia*, that regardless of whether the 7101 loan was secured by equitable lien or otherwise, no reasonable jury could conclude the CG Defendants' assertion of an unsecured loan on behalf of their clients in this context was improper. This court agrees.

The CG Defendants' November 16, 2006, letter to Stewart Title made clear it believed Covenant Group was entitled to payment from the proceeds of the sale of the Property for both the Five Star and the 7101 loans. Enclosed with the letter were beneficiary statements for both loans. No reasonable jury could conclude the November 16 letter conditioned the release of Covenant Group's security interest in the Five Star loan on payment of the 7101 loan. Urging a contrary conclusion, KT Group emphasizes language in the November 16 letter demanding "*all* sums due Covenant as set forth in the enclosed Beneficiary Statement[s]."

No reasonable reading of this language, however, indicates Covenant Group was unwilling to release its lien on one loan unless it received payment on another. Rather, the clear import of the November 16 letter was that, while the Covenant Group would no longer obstruct the sale of the Property, for instance, by withholding the beneficiary statements for its shares in the Five Star mortgage, it would hold any and all parties liable for damages it incurred if the Property were conveyed but the debts it believed were secured by the Property were not satisfied.[4]

Aside from its tying argument, KT Group advances no other theories under which a jury could conclude the CG Defendants' demand for payment of the 7101 loan constituted improper means for the purposes of KT Group's intentional interference claim. This court is not obliged to develop any such arguments on KT Group's behalf. *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1257 n.1 (10th Cir. 2001) ("We will not make arguments for [a party] that it did not make in its briefs."). Because no reasonable jury could conclude the CG Defendants conditioned the release of the Five Star mortgage on satisfaction of the 7101 loan,

---

[4]At oral argument, KT Group conceded its claims did not hinge on the delay occasioned by the CG Defendants' initial refusal to provide beneficiary statements for the Five Star loan. Therefore, even assuming the evidence supports an inference the CG Defendants were tying the 7101 loan to the Five Star loan prior to November 16, KT Group's claim still fails as a matter of law because any such tying was not what ultimately caused the failure of the sale.

the court need not decide whether the Covenant Group actually had an equitable lien at the time it made the demand for repayment of the 7101 loan from escrow.

In its Reply Brief, KT Group acknowledges the CG Defendants would not be liable for notifying the escrow agent of their interest in the Property had they done so in the form of a "polite letter" which contained no "obfuscation or intimidation." For good reason, KT Group does not attempt to argue the CG Defendants' assertion of the 7101 loan constituted improper means because it was insufficiently polite. Even KT Group's oblique references to the CG Defendants' "obfuscation" and "intimidation," however, are unsupported by the record. KT Group points to no evidence indicating the CG Defendants ever misrepresented the nature of their clients' claimed interest in the Property to the escrow agent during the relevant timeframe.[5] To the contrary, in both their November 14 email clarifying their Amended Escrow Demand and their November 16 letter to Stewart Title, the CG Defendants described the 7101 loan accurately. The November 14 email referred to "the secured Five Star loan and the unsecured [7101 loan] (which was to be secured by a deed of trust, which was never recorded)." Moreover, the responsive email from the escrow agent characterized the 7101 loan as "an unsecured loan . . . not escrow on this sale," making clear she was not under the impression the 7101 loan encumbered the Property.

---

[5]In fact, KT Group argues the Covenant Group "did not even claim a lien (equitable or otherwise) securing the 7101 Note prior to this lawsuit."

-12-

Based on the undisputed facts, no reasonable jury could conclude any of the CG Defendants' actions constituted improper means for purposes of an intentional interference claim. The district court therefore did not err in granting summary judgment in favor of the CG Defendants.

## IV. Conclusion

For the foregoing reasons, this court **AFFIRMS** the order of the district court.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge